# BECKWITH v. UNITED STATES

No. 74–1243.  Argued December 1, 1975—Decided April 21, 1976

BURGER, C. J., delivered the opinion of the Court, in which STEW-ART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in the judgment, *post,* p. 348. BRENNAN, J., filed a dissenting opinion, *post,* p. 349. STE-VENS, J., took no part in the consideration or decision of the case.

*John G. Gill, Jr.,* argued the cause and filed a brief for petitioner.

*Assistant Attorney General Crampton* argued the cause for the United States.  With him on the brief were *Solicitor General Bork, Deputy Solicitor General Frey, Stuart A. Smith,* and *Robert E. Lindsay.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The important issue presented in this case is whether a special agent of the Internal Revenue Service, investigating potential criminal income tax violations, must, in

an interview with a taxpayer, not in custody, give the warnings called for by this Court's decision in *Miranda v. Arizona,* 384 U. S. 436 (1966). We granted certiorari to resolve the conflict between the holding of the Court of Appeals in this case, which is consistent with the weight of authority on the issue,[1] and the position adopted by the United States Court of Appeals for the Seventh Circuit.[2]

The District Court conducted a thorough inquiry into the facts surrounding the interview of petitioner before ruling on his motion to suppress the statements at issue. After a considerable amount of investigation, two special agents of the Intelligence Division of the Internal Revenue Service met with petitioner in a private home where petitioner occasionally stayed. The senior agent testified that they went to see petitioner at this private residence at 8 a. m. in order to spare petitioner the possible embarrassment of being interviewed at his place of employment which opened at 10 a. m. Upon their arrival, they identified themselves to the person answering the door and asked to speak to petitioner. The agents were invited into the house and, when petitioner entered the room where they were waiting, they introduced them-

---

[1] See, *e. g., Taglianetti v. United States,* 398 F. 2d 558, 566 (CA1 1968), aff'd on another ground, 394 U. S. 316 (1969); *United States v. Mackiewicz,* 401 F. 2d 219, 221–222 (CA2), cert. denied, 393 U. S. 923 (1968); *United States v. Jaskiewicz,* 433 F. 2d 415, 417–420 (CA3 1970), cert. denied, 400 U. S. 1021 (1971); *United States v. Browney,* 421 F. 2d 48, 51–52 (CA4 1970); *United States v. Prudden,* 424 F. 2d 1021, 1027–1031 (CA5), cert. denied, 400 U. S. 831 (1970); *United States v. Stribling,* 437 F. 2d 765, 771 (CA6), cert. denied, 402 U. S. 973 (1971); *United States v. MacLeod,* 436 F. 2d 947, 950 (CA8), cert. denied, 402 U. S. 907 (1971); *United States v. Robson,* 477 F. 2d 13, 16 (CA9 1973); *Hensley v. United States,* 406 F. 2d 481, 484 (CA10 1968); but cf. *United States v. Lockyer,* 448 F. 2d 417, 422 (CA10 1971).

[2] *United States v. Dickerson,* 413 F. 2d 1111 (1969).

selves and, according to the testimony of the senior agent, Beckwith then excused himself for a period in excess of five minutes, to finish dressing.[3]  Petitioner then sat down at the dining room table with the agents; they presented their credentials and stated they were attached to the Intelligence Division and that one of their functions was to investigate the possibility of criminal tax fraud.   They then informed petitioner that they were assigned to investigate his federal income tax liability for the years 1966 through 1971.   The senior agent then read to petitioner from a printed card the following:

> "As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.
>
> "Under the Fifth Amendment to the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way.   I also advise you that anything which you say and any information which you submit may be used against you in any criminal proceeding which may be undertaken.   I advise you further that you may, if you wish, seek the assistance of an attorney before responding."   App. 65–66.

Petitioner acknowledged that he understood his rights. The agents then interviewed him until about 11 o'clock. The agents described the conversation as "friendly" and "relaxed."   The petitioner noted that the agents did not "press" him on any question he could not or chose not to answer.

Prior to the conclusion of the interview, the senior agent requested that petitioner permit the agents to

---

[3] Petitioner claimed at the suppression hearing that he was fully dressed when he first met the agents.   The District Court did not explicitly resolve this conflict in testimony.

inspect certain records. Petitioner indicated that they were at his place of employment. The agents asked if they could meet him there later. Having traveled separately from petitioner, the agents met petitioner approximately 45 minutes later and the senior agent advised the petitioner that he was not required to furnish any books or records; petitioner, however, supplied the books to the agents.

Prior to trial, petitioner moved to suppress all statements he made to the agents or evidence derived from those statements on the ground that petitioner had not been given the warnings mandated by *Miranda*. The District Court ruled that he was entitled to such warnings "when the court finds as a fact that there were custodial circumstances." The District Judge went on to find that "on this record . . . there is no evidence whatsoever of any such situation." The Court of Appeals affirmed the judgment of conviction. 166 U. S. App. D. C. 361, 510 F. 2d 741 (1975). It noted that the reasoning of *Miranda* was based "in crucial part" on whether the suspect "has been taken into custody or otherwise deprived of his freedom in any significant way," *id.*, at 362, 510 F. 2d, at 742, citing *Miranda, supra*, at 477; and agreed with the District Court that "Beckwith was neither arrested nor detained against his will." 166 U. S. App. D. C., at 362, 510 F. 2d, at 742. We agree with the analysis of the Court of Appeals [4] and, therefore, affirm its judgment.

Petitioner contends that the "entire starting point" for the criminal prosecution brought against him was secured from his own statements and disclosures during the interview with the Internal Revenue agents from the

[4] On petition for writ of certiorari to this Court, Beckwith does not challenge the further holding of the Court of Appeals that, the *Miranda* question aside, the "entire interview was free of coercion," 166 U. S. App. D. C., at 363, 510 F. 2d, at 743 (footnote omitted).

Intelligence Division. He correctly points out that cases are assigned to the Intelligence Division only when there is some indication of criminal fraud and that, especially since tax offenses rarely result in pretrial custody, the taxpayer is clearly the "focus" of a criminal investigation when a matter is assigned to the Intelligence Division. Given the complexity of the tax structure and the confusion on the part of taxpayers between the civil and criminal function of the Internal Revenue Service, such a confrontation, argues petitioner, places the taxpayer under "psychological restraints" which are the functional, and, therefore, the legal, equivalent of custody. In short we agree with Chief Judge Bazelon, speaking for a unanimous Court of Appeals, that

> "[t]he major thrust of Beckwith's argument is that the principle of *Miranda* and *Mathis* [5] should be extended to cover interrogation in non-custodial circumstances after a police investigation has focused on the suspect." *Ibid.*

With the Court of Appeals, we "are not impressed with this argument in the abstract nor as applied to the particular facts of Beckwith's interrogation." *Ibid.* It goes far beyond the reasons for that holding and such an extension of the *Miranda* requirements would cut this Court's holding in that case completely loose from its own explicitly stated rationale. The narrow issue before the Court in *Miranda* was presented very precisely in the opening paragraph of that opinion—"the admissibility of statements obtained from an individual who is subjected to *custodial* police interrogation." 384 U. S., at 439.[6] (Emphasis supplied.) The Court concluded

---

[5] *Mathis* v. *United States,* 391 U. S. 1 (1968).

[6] The Court also stated: "The constitutional issue we decide . . . is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action

that compulsion is "inherent in custodial surroundings," [7] *id.*, at 458, and, consequently, that special safeguards were required in the case of "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." *Id.*, at 445. In subsequent decisions, the Court specifically stressed that it was the *custodial* nature of the interrogation which triggered the necessity for adherence to the specific requirements of its *Miranda* holding. *Orozco* v. *Texas,* 394 U. S. 324 (1969); *Mathis* v. *United States,* 391 U. S. 1 (1968). See generally *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 247 (1973).

Petitioner's argument that he was placed in the functional, and, therefore, legal, equivalent of the *Miranda* situation asks us now to ignore completely that *Miranda* was grounded squarely in the Court's explicit and detailed assessment of the peculiar "nature and setting of . . . in-custody interrogation," 384 U. S., at 445. That Courts of Appeals have so read *Miranda* is suggested by Chief Judge Lumbard in *United States* v. *Caiello,* 420 F. 2d 471, 473 (CA2 1969):

> " 'It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the

---

in any significant way." 384 U. S., at 445. The Court specifically defined "custodial interrogation" to mean "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*, at 444.

[7] The Court gave great weight to contemporaneous police manuals and concluded that custodial interrogation was "psychologically . . . oriented," *id.*, at 448, and that the principal psychological factor contributing to successful interrogation was isolating the suspect in unfamiliar surroundings "for no purpose other than to subjugate the individual to the will of his examiner." *Id.*, at 457.

*Miranda* requirements with regard to custodial questioning.' "

*Mathis* v. *United States, supra,* directly supports this conclusion in holding that the *Miranda* requirements are applicable to interviews with Internal Revenue agents concerning tax liability, *when the subject is in custody;* the Court thus squarely grounded its holding on the custodial aspects of the situation, not the subject matter of the interview.[8]

An interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the *Miranda* Court found so inherently coercive as to require its holding. Although the "focus" of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding. *Miranda* implicitly defined "focus," for its purposes, as "questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U. S., at 444. (Emphasis supplied.) It may well be true, as petitioner contends, that the "starting point" for the criminal prosecution was the information obtained from petitioner and the records exhibited by him. But this amounts to no more than saying that a tax return signed by a taxpayer can be the "starting point" for a prosecution.

We recognize, of course, that noncustodial interrogation might possibly in some situations, by virtue of some

---

[8] Four Members of the Court joined Mr. Justice Black; the dissenters regarded *Mathis* as an extension of *Miranda* largely because the custody and the interrogation were in no way related and because a prisoner interrogated in prison was not in unfamiliar surroundings.

special circumstances, be characterized as one where "the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . . ." *Rogers* v. *Richmond*, 365 U. S. 534, 544 (1961). When such a claim is raised, it is the duty of an appellate court, including this Court, "to examine the entire record and make an independent determination of the ultimate issue of voluntariness." *Davis* v. *North Carolina*, 384 U. S. 737, 741–742 (1966). Proof that some kind of warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive. *Frazier* v. *Cupp*, 394 U. S. 731, 739 (1969); *Davis* v. *North Carolina, supra*, at 740–741. In the present case, however, as Chief Judge Bazelon noted, "[t]he entire interview was free of coercion," 166 U. S. App. D. C., at 363, 510 F. 2d, at 743 (footnote omitted).

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, concurring in the judgment.

While the Internal Revenue Service agents in this case did not give petitioner the full warnings prescribed in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), they did give him the following warning before questioning him:

> "As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.

> "Under the Fifth Amendment to the Constitution of the United States, I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate

you in any way. I also advise you that anything
which you say and any information which you sub-
mit may be used against you in any criminal pro-
ceeding which may be undertaken. I advise you
further that you may, if you wish, seek the assist-
ance of an attorney before responding." App.
65–66.

Under the circumstances of this case, in which petitioner
was not under arrest and the interview took place in a
private home where petitioner occasionally stayed, the
warning recited above satisfied the requirements of the
Fifth Amendment. If this warning had not been given,
however, I would not join the judgment of the Court.

Mr. Justice Brennan, dissenting.

I respectfully dissent. In my view the District Court
should have granted petitioner's motion to suppress all
statements made by him to the agents because the agents
did not give petitioner the warnings mandated by *Mi-
randa* v. *Arizona,* 384 U. S. 436 (1966). The Court
affirms the conviction on the ground that "[a]lthough
the 'focus' of an investigation may indeed have been on
Beckwith at the time of the interview in the sense that
it was his tax liability which was under scrutiny, he
hardly found himself in the *custodial* situation described
by the *Miranda* Court as the basis for its holding." *Ante,*
at 347 (emphasis supplied). But the fact that Beckwith
had not been taken into formal "custody" is not. deter-
minative of the question whether the agents were re-
quired to give him the *Miranda* warnings. I agree with
the Court of Appeals for the Seventh Circuit that the
warnings are also mandated when the taxpayer is, as
here, interrogated by Intelligence Division agents of the
Internal Revenue Service in surroundings where, as in
the case of the subject in "custody," the practical com-

pulsion to respond to questions about his tax returns is comparable to the psychological pressures described in *Miranda*. *United States* v. *Dickerson*, 413 F. 2d 1111 (1969); *United States* v. *Oliver*, 505 F. 2d 301 (1974). Interrogation under conditions that have the practical consequence of compelling the taxpayer to make disclosures, and interrogation in "custody" having the same consequence, are in my view peas from the same pod. *Oliver* states the analysis with which I agree and which requires suppression of Beckwith's statements:

> "The application of *Miranda* does not turn on such a simple axis as whether or not the suspect is in custody when he is being questioned. As the Court repeatedly indicated, the prescribed warnings are required if the defendant is in custody 'or otherwise deprived of his freedom of action in any significant way.' The fact of custody is emphasized in the [*Miranda*] opinion as having the practical consequence of compelling the accused to make disclosures. But the test also differentiates between the questioning of a mere witness and the interrogation of an accused for the purpose of securing his conviction; the test serves the purpose 'of determining when the adversary process has begun, i. e., when the investigative machinery of the government is directed toward the ultimate conviction of a particular individual and when, therefore, a suspect should be advised of his rights.'

> "Since the constitutional protection is expressly applicable to testimony in the criminal case itself, for the purpose of determining when warnings are required, the *Miranda* analysis treats the adversary proceeding as though it commences when a prospective defendant is taken into custody or otherwise significantly restrained. After that point is reached, it is not unreasonable to treat any compelled disclos-

ure as protected by the Fifth Amendment unless, of course, the constitutional protection has been waived. Adequate warnings, or the advise [*sic*] of counsel, are essential if such a waiver is to be effective.

"The requirement of warnings set forth in *Dickerson* rests on the same underlying rationale. While the commencement of adversary proceedings against Dickerson had not been marked by taking him into custody, the I.R.S., by assigning the matter to the Intelligence Division, had commenced the preparation of its criminal case. When the agents questioned him about his tax return, without clearly explaining their mission, the dual criminal-civil nature of an I.R.S. interrogation created three key misapprehensions for the taxpayer.

" 'Incriminating statements elicited in reliance upon the taxpayer's misapprehension as to *the nature of the inquiry, his obligation to respond,* and *the possible consequences of doing* so must be regarded as equally violative of constitutional protections as a custodial confession extracted without proper warnings.' 413 F. 2d, at 1116 (emphasis added).

"The practical effect of these misapprehensions during questioning of a taxpayer was to 'compel' him to provide information that could be used to obtain his conviction in a criminal tax fraud proceeding, in much the same way that placing a suspect under physical restraint leads to psychological compulsion. Thus, the misapprehensions are tantamount to the deprivation of the suspect's 'freedom of action in any significant way,' repeatedly referred to in *Miranda*." 505 F. 2d, at 304–305. (Footnotes omitted.)

I would reverse the judgment of conviction and remand to the District Court for a new trial.