**UNITED STATES of America**

v.

**John Ross OLSEN.**

**Crim. No. 85-00004 P.**

United States District Court,
D. Maine.

May 22, 1985.

Richard S. Cohen, U.S. Atty., F. Mark Terison, Asst. U.S. Atty., Portland, Me., for plaintiff.

Paul R. Dumas, Rumford, Me., for defendant.

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

### I.

Defendant John Ross Olsen has been charged in a one-count indictment with converting approximately twelve hundred dollars ($1,200.00) while he was employed as a postal clerk in Rumford, Maine. Defendant has moved to suppress all statements made by him to all Government agents, on the grounds that his waiver of his *Miranda* rights and his subsequent confession were given involuntarily.

On March 30, 1984, an apparent burglary was discovered at the United States Post Office in Rumford, Maine. A window had been broken, four locked drawers had been

pried open and Olsen and another postal clerk each reported the loss of approximately one thousand dollars ($1,000.00) in twenty cent stamps.

Postal Inspectors Sidney Kerr and Martin Davis arrived at the post office on March 30 to investigate the matter. When Inspector Kerr audited Olsen's postal drawer he found that nine hundred seven dollars ($907.00) was missing. Olsen said nothing by way of explanation of the shortage at that time. Kerr later determined, based upon the position and condition of the broken window, that it was unlikely that someone had actually gained access from the outside of the building. Kerr also knew that Olsen had previously been informed that he was scheduled to undergo an audit of his postal drawer on March 27, but that the audit was postponed because he had left work early on that day, complaining of illness.

At approximately 4:30 p.m., Inspectors Kerr and Davis asked Olsen to join them in the Postmaster's office. Kerr told Olsen that as a result of his investigation he believed that a burglary had not in fact occurred, but that there had been an embezzlement. Kerr told Olsen that he believed Olsen had committed the crime. He told Olsen not to say anything. He removed a laminated card from his wallet containing *Miranda* warnings and read it to Olsen. The material read to him was an accurate statement of the *Miranda* warning. Olsen said he understood the rights as they had been read to him. Inspector Kerr then showed Olsen PS Form 1067, which contains a printed *Miranda* warning. *See* Government's Exhibit 1, Appendix 1. Olsen read the warning and signed the top half of the form, indicating *that he had read the statement and understood it.* The time of his execution of the form was noted thereon as 4:40 p.m.

The parties disagree as to the content and significance of the discussion that followed. Neither party disputes, however, that at 5:20 p.m. Olsen signed the waiver portion of Form 1027, which provides:

I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Government's Exhibit 1, Appendix 1. At approximately, 6:36 p.m., Olsen completed a written statement in his own hand in which he admitted that he had taken money in amounts of twenty dollars ($20.00) or less from his drawer over a period of time and that he staged the burglary in order to provide authorities an explanation for the shortage. Government's Exhibit 2. It is this written statement and all oral statements made by Olsen on March 30 that he wishes to suppress.

Inspector Kerr, Olsen, and Olsen's wife testified at the evidentiary hearing on this motion. Olsen claims that, by express or implied promises made by Inspector Kerr, he was induced to sign the waiver of his *Miranda* rights and to give oral and written statements. Olsen asserts that Inspector Kerr led him to believe that if he did not retain a lawyer and if he fully cooperated, by resigning his position and making restitution for the amount taken, Inspector Kerr would recommend to the United States Attorney that he not be prosecuted. Tr. 44,48. He understood that if he fully cooperated, "that would be the end of the whole thing." Tr. 48.

Two closely related issues, each implicating aspects of Defendant's privilege against self-incrimination, are presented in this motion: first, whether Olsen voluntarily waived his *Miranda* rights and, second, whether Olsen's statements were given voluntarily by constitutional standards.

## II.

### A.

■ The rights set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), attach only when interrogation is "custodial." *Beckwith v. United States*, 425 U.S. 341, 346, 96 S.Ct. 1612,

1616, 48 L.Ed.2d 1 (1976). The warnings required by *Miranda* were intended to eliminate the coercion inherent in situations in which a defendant reasonably believes that he is not free to leave. *See Miranda*, 384 U.S. at 477–78, 86 S.Ct. at 1629–30; *Beckwith*, 425 U.S. at 346, 96 S.Ct. at 1616. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way."* *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added).

■ In the First Circuit, the applicability of *Miranda* must be determined by an objective rather than a subjective test. *Borodine v. Douzanis*, 592 F.2d 1202, 1206 (1st Cir.1979). There must be some objective manifestation that the Defendant was deprived of his freedom of action in a significant way before *Miranda* principles become operative. *Id.* This Court's review of the circumstances surrounding Olsen's interrogation leads it to conclude that Olsen was subjected to "custodial interrogation" on March 30, 1984.

■ Postal Inspector Kerr asked Olsen to join him and Inspector Davis in the Postmaster's office at 4:30 p.m. Tr. 5. At that point, Inspector Kerr believed that Olsen had faked the burglary to disguise his own embezzlement, and, after he, Davis and Olsen sat down in the office, Kerr told this to Olsen. Tr. 6. Inspector Kerr did not arrest Olsen, but he did not tell him that he was free to leave. It appears that there was probable cause to arrest Olsen, and Kerr might legally have done so had Olsen attempted to leave.[1] He was placed in an office behind a closed door with two law enforcement officers and detained beyond his normally scheduled working period. Tr. 6. A person in his position could not have reasonably believed that he was free to leave.

In *Beckwith,* the Supreme Court made it clear that the fact that a suspect is the "focus" of an investigation does not trigger application of *Miranda. Beckwith,* 425 U.S. at 345–48, 96 S.Ct. at 1615–17. Here, however, there are circumstances absent from the *Beckwith* case that support a finding of custodial interrogation. The most important distinction is that Beckwith had been interviewed in his home, after he invited in two agents of the Internal Revenue Service. Olsen, on the other hand, was taken to a private office behind a closed door on federal premises; the questioning was conducted well after 4:00 p.m., which is the usual close of his work day. Additionally, in this case, the agents apparently were convinced that they had established a case for a charge of embezzlement against Olsen, and they told him as much. In *Beckwith,* the defendant may have been the focus of the investigation, but the interrogation was clearly exploratory in nature, and there were no objective indicia that the agents had either the intent or justification to hold the defendant in custody. *Compare also Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (Defendant voluntarily went to police station, where he was immediately told he was not under arrest); *United States v. Pratt,* 645 F.2d 89 (1st Cir.1981), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981) (questioning by customs agents was limited, routine and of brief duration); *Borodine v. Douzanis,* 592 F.2d 1202 (1st Cir.1979) (questioning in laundry room at scene of murder by police officer having no idea what happened was general, routine and necessary to preliminary investigation).

---

**1.** Inspector Kerr possessed evidence that it was highly unlikely that the post office had actually been burglarized. He knew that several days earlier Olsen had left work complaining of illness *after* being told that his drawer was to be audited. He knew that Olsen's was one of only two drawers showing shortages following the apparent burglary. He reasonably could have believed that it was likely that a crime had been committed and that Olsen had committed it or had participated in its commission. *See Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 412, 9 L.Ed.2d 441 (1963). Postal inspectors are authorized to make warrantless arrests for felonies under 18 U.S.C. § 3061(a)(3). The offense charged, 18 U.S.C. § 1711, is a felony. *See* 18 U.S.C. § 1.

### B.

■ Because Olsen was subjected to custodial interrogation within the meaning of *Miranda,* he was entitled to the rights described in *Miranda.* Before asking any questions, Inspector Kerr read Olsen legally sufficient *Miranda* warnings from a card. Tr. 6, 36. Then he showed Olsen PS Form 1067, which contains a printed list of *Miranda* warnings. Tr. 7. Olsen read these and signed a statement indicating that he had read and understood them. *Id.* Forty minutes later, Olsen signed a waiver of the rights at the bottom of Form 1067. *See* Appendix 1.

The Government has the burden of proving that this waiver was voluntary. *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628; *Fuentes v. Moran,* 733 F.2d 176, 180–81 (1st Cir.1984). The question of waiver must be decided on "the particular facts and circumstances surrounding [this] case, including the background, experience and conduct of the accused." *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758–59, 60 L.Ed.2d 286 (1979); *Fuentes,* 733 F.2d at 181.

■ Recollections differ as to what occurred during the forty-minute period between 4:40 p.m. and 5:20 p.m. Inspector Kerr testified that during that period he explained why he thought Olsen was the perpetrator, and that Olsen said nothing. Tr. 8–9. He estimated that this occupied a period of about forty-five minutes. Tr. 8. At the end of that period, Kerr testified, he asked Olsen if he would be willing to answer questions, and Olsen signed the *Miranda* waiver. Tr. 9.

Olsen testified that he claimed his right to have an attorney before he signed the printed waiver form. Tr. 40. He said he was then told that if he obtained an attorney, it would lengthen the investigation and that "it would probably go much worse for me if I had a lawyer." Tr. 41. Olsen testified that Inspector Kerr spent some time during the forty-minute interval explaining the difficulties that Olsen's retaining an attorney would cause. Inspector Kerr denied on cross-examination that Olsen asked for an attorney and that he said anything to Olsen about an attorney slowing down an investigation.

The Court finds that although Olsen may have inquired about an attorney at some point, he did not request one before he signed the *Miranda* waiver. The weight of the evidence supports Inspector Kerr's testimony that Olsen did not ask for an attorney prior to signing the waiver. Kerr gave Olsen *Miranda* warnings twice, once orally and once on a printed form, and Olsen indicated that he understood the warnings. Olsen's assertion that he asked for an attorney and was persuaded not to retain one *before* he signed the printed waiver form does not square with Kerr's scrupulous regard for the formalities dictated by *Miranda.* Kerr's testimony, the signed waiver, and all circumstances surrounding the waiver are sufficient evidence to sustain the Government's burden of proving that Olsen voluntarily signed the printed *Miranda* waiver.

### C.

Even if Olsen voluntarily signed the printed waiver at 5:20 p.m., he retained the right under *Miranda* to cut off questioning at any time. 384 U.S. at 474, 86 S.Ct. at 1628. The Supreme Court there stated:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.

*Id.* Thereafter,

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

*Id.* at 475, 86 S.Ct. at 1628. *See also Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Certain

evidence circumstantially supports the view that Olsen, at some point, discussed with Kerr his need for an attorney. Susan Olsen, Defendant's wife and a credible witness, testified that she spoke with Olsen on March 30, 1984, immediately after he arrived at his parent's house following the interrogation. Tr. 52. On questioning by Olsen's attorney, she testified:

A At first, he just told me it was all over, and I told him what was over? He said he was all done working. And I asked him why, and he said a whole bunch of trouble up there, and I said did you need a lawyer? Is something really wrong? He said, "No, I didn't need a lawyer. The Inspector there said everything would be all right as long as I signed, paid back the money and resigned my job." And he was so upset and I got upset, and we just kept talking, and I kept insisting that he should get a lawyer, and he said, no, that he really trusted them.

Q That he trusted who?

A The Inspectors.

Tr. 52–53. This testimony corroborates Olsen's testimony that he discussed obtaining a lawyer with Kerr. It sheds no light, however, on the issue of when that discussion occurred during the course of the interview.

In addition, Olsen testified that Kerr told him by telephone some time in September that he should hire a lawyer. Tr. 48. Mrs. Olsen corroborated this statement. Tr. 54. Kerr testified that he did not recall such a telephone conversation, but he conceded that one might have occurred. Tr. 19. The inference that may be drawn from Kerr's having advised Olsen to retain an attorney is that Kerr told Olsen on March 30 that he did not need an attorney. This inference is consistent with Kerr's reasonable belief that it was unlikely that Olsen would be prosecuted.[2]

Inspector Kerr testified that he did not "recall" the subject of a lawyer "ever coming up" on March 30, 1984, or at any other time. Tr. 20. Defendant's attorney pressed him further, asking, "Did he or did he not speak to you about a lawyer on March 30, 1984?" Kerr replied, "No." The Court finds Kerr's first response—that he did not recall discussing a lawyer on March 30, 1984—to be credible. The Court gives no weight to his subsequent inconsistent response because it was prompted only by defense counsel's insistence upon a "yes" or "no" answer.

Despite Inspector Kerr's failure of recollection, the Court finds that Olsen and the inspectors did discuss the matter of Olsen's need for an attorney. On this record, it is not clear, on the one hand, whether Olsen requested that he speak to an attorney before answering further questions or, on the other hand, whether he inquired if he should retain an attorney to represent him in future proceedings. The Court rejects any assertion, however, that Olsen unequivocally asserted his right to speak to an attorney before proceeding with questioning. Nevertheless, the Court finds that, at the very least, the subject of Olsen's retaining an attorney was raised.

The Court of Appeals for the First Circuit dealt with an equivocal invocation by a defendant of his right to speak to an attorney during police questioning in the recent case of *United States v. Porter*, 764 F.2d 1, (1st Cir. 1985). The Defendant argued that he asserted his right to counsel by making a telephone call to his attorney in the presence of a government agent. Id., 7. The First Circuit treated Defendant's call to his attorney as an invocation of his right to an attorney. The lack of analysis in the majority opinion respecting this issue severely undercuts its value as analogous authority for deciding this case.

Chief Judge Campbell, however, writing *dubitante*, urged closer analysis of the

---

**2.** The basis for Kerr's expectation that Olsen would not be prosecuted is discussed in Part III of this Opinion.

question and particularly favored adoption of the Fifth Circuit's approach to equivocal requests for an attorney. *Porter, supra,* (Campbell, C.J., *dubitante*). Judge Campbell quoted from the Fifth Circuit's holding in *Thompson v. Wainwright,* 601 F.2d 768 (5th Cir.1979):

> whenever even an equivocal request for an attorney is made by a suspect during custodial interrogation, the scope of that interrogation is immediately narrowed to one subject and one only. *Further questioning thereafter must be limited to clarifying that request* until it *is* clarified. When and if it is clarified as a present desire for the assistance of legal counsel, *all* interrogation must cease until that is provided, just as in the case of an initial, unambiguous request for an attorney. And no statement taken after that request is made and before it is clarified as an effective waiver of the present assistance of counsel can clear the *Miranda* bar. Thus, by [this rule,] we avoid attributing a talismanic quality to the word "attorney" falling from a suspect's lips, while at the same time safeguarding his right to the assistance of counsel when he wants it and says so.

*Id.* at 771–72 (emphasis in original). Under the Fifth Circuit approach, a government agent may not simply ignore an equivocal request for an attorney, but must clarify that request before proceeding with substantive questioning. In this case, after the subject of an attorney was raised, the Court finds, the postal inspectors did not attempt to clarify the request. The Court, therefore, must treat Olsen's inquiry regarding an attorney as an invocation of his right to an attorney.

■ Of course, a defendant may waive his right to counsel, expressly or implicitly, after having invoked it. *See North Carolina v. Butler,* 441 U.S. 369, 372–76, 99 S.Ct. 1755, 1756–59, 60 L.Ed.2d 286 (1979). Under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), after an accused has invoked his right to counsel, a valid waiver of that right cannot be es-

tablished by a showing that he has responded to further police-initiated questioning. *Id.* at 484, 101 S.Ct. at 1884. No further interrogation is permitted unless the accused himself initiates further communication. *Id.* at 484–85, 101 S.Ct. at 1884. *See also Porter, supra,* 764 F.2d at 8.

■ The Government has the "heavy burden" of showing that there was a knowing and intelligent waiver. *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628. In this case, the allocation of the burden of proof is decisive. The Defendant has produced evidence supporting the inference that he asked to have an attorney. The Government has not effectively rebutted the inference, nor has the Government established that Olsen knowingly and intelligently waived his right to counsel after having orally invoked it.

It is critical to determine when the discussion concerning a lawyer took place. The Court has found that it did not occur before Olsen signed the printed waiver form. Nor did it take place after the written statement was completed. Tr. 16. It is unlikely that Olsen inquired about an attorney immediately after signing the printed waiver of his right to a lawyer. It is more likely that the discussion concerning Olsen's need for an attorney took place when Olsen and Kerr discussed what was likely to happen to Olsen.[3] The Court finds that this conversation took place after Olsen orally admitted his responsibility, but before he prepared the written statement. Accordingly, the interrogation should have stopped at that point, and the written statement taken subsequent to that time must be suppressed because it was taken in violation of *Miranda* rules.

### III.

■ Distinct from the issue of the voluntariness of a *Miranda* waiver is the question whether the confession itself was given voluntarily, or was induced by threats or promises. The Government must prove

---

**3.** See Part III of this Opinion.

by a preponderance of the evidence that the confession was voluntarily made. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). The confession must not have been " 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.' " *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (quoting *Bram v. United States,* 168 U.S. 532, 542–543, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897)).

 Here, Olsen claims that his confession was extracted by direct or implied promises. After carefully reviewing the evidence, the Court has determined that Kerr did indeed make some implied promises to Olsen upon which Olsen reasonably relied. Kerr testified that he told Olsen that he had no control over the decision to prosecute and that he was to report the results of his investigation to the United States Attorney. He testified that he told Olsen that the United States Attorney had the option of prosecuting Olsen for a felony or a misdemeanor, or electing "pretrial diversion." He also told Olsen that if he cooperated, by resigning and agreeing to full restitution, Kerr would inform the U.S. Attorney that he had done so. Tr. 26, 27.

Olsen's testimony differs from Inspector Kerr's, but the two versions are largely reconcilable. Olsen testified that he believed that if he cooperated, he would not be prosecuted. The Court finds this belief, on the basis of other statements made by Inspector Kerr, to be reasonable. Kerr testified at the suppression hearing that he believed that Olsen would receive the same treatment as persons had received, in his experience, in similar situations in Massachusetts, that is, pretrial diversion. Tr. 27. This belief was consistent with Kerr's 17 years of experience with respect to prosecution of postal workers. *See* Tr. 22. Moreover, upon being asked whether Olsen thought his cooperation would result in assistance from Kerr, Kerr stated, "It's possible, sure." Tr. 29.

The timing of these discussions and their causal connection to the giving of any confession by Olsen is critical. Inspector Kerr testified that after Olsen signed the waiver, he asked Olsen whether Olsen had staged the burglary and embezzled money or stamps. Tr. 10. Olsen at first denied that he had. *Id.* Then Kerr told Olsen that he and his fellow clerk, William LaFleur, would each have to pay for the value of missing stamps because they had not adhered to postal service security regulations regarding the storage of the stamps. Tr. 11. At that point, prompted by his fear that LaFleur, his innocent co-employee, would have to pay $1,000, Olsen admitted to staging the burglary and embezzlement. Tr. 11.

Kerr testified that after Olsen made his admission, Olsen asked what would happen to him. Tr. 14. Olsen's inquiry prompted Kerr's statements concerning the United States Attorney's options, the likelihood of prosecution and the value of Olsen's cooperation. Tr. 14, 15.

Kerr's testimony concerning the timing of his statements is consistent with a realistic sequence of events. Inspector Kerr's testimony that he made his statements in response to Olsen's inquiries was not directly contradicted by Olsen. The Court is not persuaded that Inspector Kerr volunteered, unprompted by Olsen's inquiries, the information that caused Olsen to believe that he would not be prosecuted. The Court is satisfied that the discussions resulted from Olsen's inquiries, and as has been noted, that these inquiries came after Olsen orally confessed. This view of the facts is supported by the final sentence of Olsen's statement: "I could not keep silent knowing that Clerk LaFleur would have to pay back what I took." Government's Exhibit 2. Apparently, this statement was dictated by Kerr to Olsen, based upon Olsen's previous oral statement. It is in Olsen's own hand, however, and he did not deny such motivation for his acts. He admitted in testimony that protecting LaFleur was at least one reason why he confessed. Tr. 50–51.

The Court finds, therefore, that the discussions which led Olsen to believe that he would not be prosecuted took place *after* he gave his oral confession. However, these discussions took place *before* Olsen prepared the written statement. Tr. 23, 24. The Court has found that Kerr's representations caused Olsen to reasonably believe that if he fully cooperated, he would not be prosecuted. The evidence, therefore, supports an inference that Kerr's statements, although made in good faith, caused Olsen to prepare the written statement with the expectation that doing so, in combination with his cooperation in other respects, would accrue to his benefit. Olsen had such a belief and it was a reasonable one under all the circumstances. Once again, the allocation of the burden of proof is decisive; the Government has failed to rebut the inference that the written confession was given involuntarily and thus has not sustained its burden of proof. Therefore, the written statement must be suppressed on the additional ground that it was not given voluntarily. However, the oral statements made before Olsen raised the inquiry about what action the Government would take against him are not subject to suppression. They are untainted by the discussion of that subject matter.

Accordingly, it is ORDERED that the written statement of March 30, 1984, prepared by Defendant, be, and is hereby SUPPRESSED and it shall not be admitted as evidence against him in any trial in which he is a defendant and the Defendant's Motion to Suppress is in all other respects DENIED.

So ORDERED.