# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #031

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **27th day of June, 2025** are as follows:

**BY Hughes, J.:**

2024-KK-01224    *STATE OF LOUISIANA    VS.    JOHN NOEHL AND ANALISE NOEHL (Parish of East Baton Rouge)*

REVERSED AND REMANDED. SEE OPINION.

Guidry, J., dissents and assigns reasons.

SUPREME COURT OF LOUISIANA

No. 2024-KK-01224

STATE OF LOUISIANA

VS.

JOHN NOEHL AND ANALISE NOEHL

On Supervisory Writ to the 19th Judicial District Court,
Parish of East Baton Rouge

**HUGHES, J.**

This case concerns whether the trial court properly granted the defendants' motion to suppress statements made to police at the hospital while their infant son was being treated for life-threatening injuries. Specifically at issue is whether the defendants were in custody and should have been Mirandized prior to questioning by the police. We granted the writ application filed by the State of Louisiana, and for the following reasons we reverse the trial court's decision and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

Defendants John and Analise Noehl were indicted on March 8, 2023 as principals to the second-degree murder of D.N. in violation on La. R.S. 14:30.1, as principals to second-degree cruelty to a juvenile in violation of La. R.S. 14:93.2, and as principals to cruelty to a juvenile in violation of La. R.S. 14:93(A)(1). Thereafter, the defendants filed a motion to suppress statements, arguing that statements made by the defendants to police officers were inadmissible as they were given in violation of rights guaranteed by the United States Constitution as interpreted in *Miranda v. Arizona*, 384 U.S. 436 (1966) as well as rights guaranteed by the Louisiana constitution.

At the hearing on February 6, 2024, the following facts were established. On the evening of May 24, 2022, Analise Noehl, the mother of seven-week-old D.N., called 9-1-1 because D.N. was having trouble breathing and was vomiting. EMS brought the infant to Ochsner Medical Center, and John and Analise Noehl, D.N.'s parents, also went to the hospital. The infant was examined by the attending emergency room physician, Dr. Leo Verlander, who initially observed that D.N. had fixed pupils and no respiratory effort. Further testing and examination revealed that the infant had a skull fracture, intracranial bleeding, and fractured ribs, which had already begun healing and were inconsistent with CPR. Dr. Verlander relayed this information to East Baton Rouge Sheriff's Office Deputy Gayla McMullan, who was working at the hospital that night. Due to the severity of the injuries D.N. presented, Deputy McMullan called for detectives to come to the hospital and also reported the incident to DCFS.[1]

When Detectives Dana Atkins and Kevin Johnson arrived at the hospital, they were told by hospital staff that D.N. had head trauma and was having trouble breathing, and it "wasn't looking good." Once they were told that the injuries could lead to death, detectives called for a homicide detective. Detective Markus Sylvester responded to the hospital and received a debriefing from his colleagues. Detective Sylvester and Detective Johnson then sought to speak to John and Analise.

Detective Sylvester testified he and Detective Johnson approached the Noehls, who were standing at the foot of the bed where D.N. was being treated. Detective Sylvester could not recall if he or Detective Johnson made the request to

---

[1] Her calls were recorded, and in one call to EBRSO Communications she states:

> Seven weeks old, they did a CAT scan and all that stuff, the eyes are, the pupils are blown and all, . . . like a choking like they said it choked on its [f-ing] bottle. This baby didn't choke on no bottle. This baby has got multiple rib fractures, multiple skull fractures. And these rib fractures are, have been there long enough that they're starting to heal . . . It's seven weeks old and like I said I need them up here like quick cause this baby's already been scheduled to be taken to New Orleans. So that means his parents will be leaving with him.

speak to the Noehls, but he testified that it would be "fair to say" he introduced himself to the Noehls and said, "I would like to get a statement to see what's going on" and "can [you] come talk to me." Detective Sylvester testified that the Noehls agreed.

Analise testified at the hearing. She testified that Detective Johnson gave her the "direction" to go with him to the adjacent hospital room. John also testified at the hearing. John said it was Detective Johnson who led him into the adjacent hospital room by saying "Please come with us. We have some questions we would like to ask."

Detective Sylvester and Detective Johnson interviewed John and Analise separately, in part so that one parent could stay with D.N. Detective Johnson also testified he usually spoke to individuals of a group one at a time so each person can speak freely. The interviews of both parents took place in a hospital room adjacent to D.N.'s with the door closed. Detective Sylvester testified he was wearing plainclothes, with a badge and a gun, and that Detective Johnson was wearing a badge identifying himself as law enforcement.

Analise's interview lasted about 18 minutes and John's lasted 12 minutes. During this time, the detectives asked the parents about the D.N.'s health, routines, feedings, sleeping arrangements, and history of falls. The parents were also asked what the family did that day, who primarily took care of the infant, others who might have cared for the infant, if the child was ever left alone, and what children and pets lived in the house.

Analise and John could both be described as cooperative in answering questions, with Analise and the officers laughing a bit over taking care of babies. Overall, the tenor of the questions by the detectives and answers by the parents was calm. However, Analise and John testified that neither felt that they could leave the interview.

3

During the interview with Analise, Detective Sylvester told her he would be going to the family home to take pictures and see if they could figure out how the baby was injured. He said, "so we need to go into the house, and it's a strong possibility we will just have to get a key." Analise replied that her in-laws were at the house and that she could alert them that the detectives wanted to enter.

At the end of each interview, the Noehls were provided with contact information for Detective Sylvester and were allowed to leave the room where the interview occurred. At the end of the interview with Analise, she was told "I'll let you get back to your baby." At the end of the interview with John, he was told, "I'll let you get back to your wife."

After speaking with the detectives, John and Analise left Ochsner Hospital to travel to New Orleans where D.N. was being transported. Detectives Johnson and Sylvester testified that at this point in the investigation, it was not reasonable to detain John or Analise. Detective Sylvester did obtain a search warrant for the Noehl's home within an hour after the interviews concluded.

When D.N. died three days later, Detective Sylvester was told by a doctor in New Orleans that the injuries were not accidental. This was also the finding of the autopsy. At this point, Detective Sylvester contacted John, and he declined to speak without a lawyer. Ultimately, Detective Sylvester obtained an arrest warrant for John and Analise.

The trial court granted the motion to suppress. In its written reasons, the trial court found that the defendants were the subjects of custodial interrogations and should have received Miranda warnings. The trial court found that the interaction between the officers and the defendants amounted to an interrogation because the officers should have known that their words or actions were "reasonably likely to elicit an incriminating response from the subject." The trial court pointed to the initial call from Deputy McMullan to EBRSO in which she stated that she did not

4

believe the parents' representations that the infant choked while drinking a bottle and that officers should come quickly to the hospital because the infant and parents would soon be transferred to New Orleans. The trial court also wrote that calling in a homicide detective and interviewing the parents separately supported a finding that the defendants were being interrogated.

The trial court then wrote that the defendants were in custody when they were speaking to the officers based on an "objective test":

> [A] suspect is in custody when the totality of the circumstances suggests that their freedom has been significantly restrained to a degree consistent with a formal arrest. *State v. Shirley*, 10 So.3d 224, 229 (La. 2009). Factors relevant to this determination include 1) whether there was probable cause to arrest, 2) whether the investigation had focused on the suspect, 3) whether under the circumstances a reasonable person would have believed he was in custody, 4) whether the statements and actions of the suspect indicated a belief he was in custody, and 5) whether the statements and actions of officers indicated an intent to restrain the suspect. *State v. Redic*, 392 So.2d 451, 453 (La. 1980).

As to the first factor, the trial court noted that Detective Sylvester was able to get a search warrant for the home based only on information he had before he interviewed the defendants. As to the second factor, the trial court again considered the call from Deputy McMullin and the initial officers requesting a homicide detective was "indicative of a more skilled investigation." As to the third factor, the trial court emphasized that the defendants were "directed, not asked" to go into the other room and that the defendants testified they did not feel free to leave. As to the fourth factor, the trial court concluded that it is "reasonable to believe that John and Analise would only leave their child's bedside if they believed that they had no choice in the matter." As to the fifth factor, the trial court cited in support of its ruling Deputy McMullin's concern that the defendants were going to leave the hospital, Detective Sylvester's use of words that "do infer a sense of authority over the Noehls," separating the Noehls to interview them, and shutting the door of the interview room.

The court of appeal denied the State's writ in a 2-1 decision. *State v. Noehl*, 24-481 (La. App. 1 Cir. 9/3/24) (unpub.).[2] The State filed a writ with this court, which was granted and set for oral argument. *State v. Noehl*, 24-1224 (La. 2/5/25), 400 So.3d 103. After the writ was granted, counsel for John Noehl filed an "Unopposed Motion to Remove Defendant" because John "unexpectedly passed away" on March 22, 2025. This court granted the motion.

## LAW AND ANALYSIS

Appellate courts review trial court rulings under a deferential standard with regard to factual and other trial determinations, while legal findings are subject to a de novo standard of review. *State v. Wells*, 08-2262 (La. 7/6/10), 45 So.3d 577, 580. The State bears the burden of proving the admissibility of a purported confession or statement by the defendant when the legality of a statement is placed at issue by a motion to suppress evidence. La. C.Cr.P. art. 703(D).

There are protections against self-incrimination in the federal and state constitutions. The Fifth Amendment of the United States Constitution provides in part, "No person . . . shall be compelled in any criminal case to be a witness against himself." Article 1, Section 13 of the Louisiana constitution provides in part:

> When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel. In a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him.

---

[2] Judge Greene dissented, reasoning:

> The subjective view of the detectives that the defendants were suspects, if undisclosed, has no bearing upon the question of whether the defendants were in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *State v. Joseph*, 2005-2169 (La. App. 1st Cir. 12/28/06), 2006 WL 3813708, *8 (unpublished), *writ denied*, 2007-0273 (La. 10/5/07), 964 So.2d 384. The defendants voluntarily entered the hospital room for questioning and their freedom of movement was not restricted in any manner. *See Joseph*, 2006 WL 3813708 at *9. Thus, I would find they were not in custody at the time of the statements at issue.

6

The seminal case concerning the federal right to remain silent is *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the United States Supreme Court wrote:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Id.* at 444. The primary concern in M*iranda* was that the "compulsion inherent in custodial surroundings" would render a statement obtained from the defendant not a product of his or her free choice. *Id.* at 458. The safeguards delineated in *Miranda* sought to end "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." *Id.* at 445.

Thus, the issue before our court in this case is whether the defendants were in "custody or otherwise deprived of [their] freedom of action in any significant way" or "arrested or detained in connection with the investigation or commission of any offense" thereby requiring officers to Mirandize the defendants. *Miranda*, 384 U.S. at 444; La. Const. Article 1, Sec. 13.

Since *Miranda*, numerous cases have been decided to elaborate on whether a defendant was subject to custodial interrogation and what circumstances rise to the level of a person being "deprived of his freedom of action in any significant way." In *Oregon v. Mathiason*, the Court stated that the obligation of an officer to give Miranda warnings attaches, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S.

492, 495 (1977). In *California v. Beheler*, the Court held that all circumstances surrounding the interrogation must be considered, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Mathiason*, 429 U.S. at 495).

In *Beckwith v. United States*, the issue presented to the Court was whether *Miranda* is triggered once a police investigation has focused on the subject even though the interrogation was not custodial in nature. *Beckwith v. United States*, 425 U.S. 341 (1976). In *Beckwith*, the defendant was not given a Miranda warning when special agents with the Internal Revenue Service sought to interview the defendant at his home and acquire financial documents. *Id.* at 341-42. The agents told the defendant that one of their functions was to investigate the possibility of criminal tax fraud and that they were assigned to investigate his federal income tax liability for certain years. *Id.* at 343. The defendant spoke with the agents and also gave them record books. *Id.* at 343-44.

The Court ruled that the defendant did not need to be Mirandized, even though he undoubtedly was the focus of the investigation, because it was the "[c]ustodial nature of the interrogation which triggered the necessity" of the warnings. *Id* at 346. To hold otherwise would "ignore completely that Miranda was grounded squarely in the Court's explicit and detailed assessment of the peculiar 'nature and setting of . . . in-custody interrogation.'" *Id.* (quoting *Miranda*, 384 U.S. at 445). The *Beckwith* Court continued:

> An interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the Miranda Court found so inherently coercive as to require its holding. Although the 'focus' of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the Miranda Court as the basis for its holding. Miranda implicitly defined 'focus,' for its purposes, as 'questioning initiated by law enforcement officers [a]fter a person has

been taken into custody or otherwise deprived of his freedom of action in any significant way.' 384 U.S., at 444 . . . It may well be true, as petitioner contends that the 'starting point' for the criminal prosecution was the information obtained from petitioner and the records exhibited by him. But this amounts to no more than saying that a tax return signed by a taxpayer can be the 'starting point' for a prosecution.

*Id.* at 347.

In *Berkemer v. McCarty*, the Court considered whether a traffic stop "exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). In this case the traffic officer decided as soon as the defendant stepped out of his car that he would be taken into custody and charged with a traffic offense, however, the officer never communicated his intention to the defendant. *Id.* at 442. In holding that the defendant did not need to be Mirandized during the roadside stop, the Court reasoned:

[The defendant] has failed to demonstrate that, at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with a formal arrest. . . . A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; **the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation**.

*Id.* at 441-42 (Emphasis added).

In *Stansbury v. California*, the Supreme Court again examined if an officer's subjective and undisclosed view of whether the person being interrogated is a suspect is relevant to assess whether that person is in custody for Miranda purposes. *Stansbury v. California*, 511 U.S. 318 (1994). In *Stansbury*, police sought to interview a man as a potential witness to a girl's rape and murder. *Stansbury*, 511 U.S. at 319. Officers went to the man's home, the man agreed to an interview at the police station, and the man rode there in the front seat of a police car. *Id.* at 320. After the man gave several answers, such as the car he was driving the night of the girl's disappearance and his criminal background, police began to suspect him. *Id.* The Court held that an officer's uncommunicated views on whether someone is a

9

suspect is not to be considered when determining if someone is in custody for purposes of Miranda. *Id.* at 319.

Relying on *Beckwith* and *Berkmer* among other cases, the *Stansbury* court opined that "[i]t is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda." *Stansbury*, 511 U.S. at 324. Unless such thoughts are conveyed to the person being questioned,

> . . . an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview and thus cannot affect the Miranda custody inquiry. 'The threat to a citizen's Fifth Amendment rights that Miranda was designed to neutralize has little to do with the strength of an interrogating officer's suspicions.'

*Id.* at 324-25 (quoting *Berkemer*, 468 U.S. at n.22). If the officer's beliefs are communicated, the Court continued, "[t]hose beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Id.* at 325 (quoting *Berkemer*, 468 U.S. at 440). Even a direct statement from law enforcement that the person being questioned is a "prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Id.*

In *State v. Saltzman*, 03-1423 (La. 4/8/04), 871 So.2d 1087 (per curiam), this court relied on *Stansbury* in holding that a defendant's statements made to police officers before he was Mirandized were admissible. *See also State v. Charles*, 09-433 (La. 9/4/09), 16 So.3d 1166 (per curiam). In *Saltzman*, the trial court considered whether an aggravated rape and incest suspect should have been Mirandized before he made incriminating statements during an interview at the Office of Child Services. According to the evidence presented, he attended the interview voluntarily and free of coercion. During the interview, child protection investigators "cajoled the defendant to stop lying" after he initially denied any wrongdoing, and when the

defendant asked if he was going to jail, the officer said he would discuss the answer to that question with the other investigators at the end of the interview. *Saltzman*, 871 So.2d at 1088. At the end of the interview, the suspect was put under arrest.

At the hearing on the motion to suppress, the interviewing officer testified that the defendant "probably would not have been free to go" after he then began making inculpatory admissions. *Id.* at 1089. The trial court denied the motion to suppress. The appellate court reversed, holding that Miranda warnings should have been issued prior to the defendant's statements because the statements were made during a custodial interrogation. *State v. Saltzman*, 02-1350 (La. App. 3 Cir. 4/23/03), 843 So.2d 1206, 1208, *writ granted*, *judgment vacated in part*, 03-1423 (La. 4/8/04), 871 So.2d 1087. The appellate court arrived at this conclusion after applying the four factors outlined in *State v. Thompson*, 399 So.2d 1161 (La. 1981):

> The determination of whether the detention is significant is to be made objectively from the totality of the circumstances.... Factors relevant to the determination include (1) whether the police officer had reasonable cause under C.Cr.P. 213(3) to arrest the interrogee without a warrant; (2) the focus of the investigation on the interrogee; (3) the intent of the police officer, determined subjectively; and (4) the belief of the interrogee that he was being detained, determined objectively.

*State v. Saltzman*, 843 So.2d at 1212. This court reversed and reinstated that trial court's denial of the motion to suppress, without mention of the four-factor test found in *Thompson* in light of the more recent decision of *Stansbury*. This court opined: "That an individual is a suspect of the police conducting a criminal investigation therefore does not determine whether the interrogation occurs in a custodial context for purposes of Miranda." *Saltzman*, 871 So.2d at 1088. Rather, courts must consider all circumstances surrounding the interrogation, and "'the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quoting *Stansbury v. California*, 511 U.S. at 322). Given that the defendant went to the Office of Child Services voluntarily, was not arrested or restrained until after he made the

statements, and that the officer did not tell the defendant the officer's thought that the defendant was not free to go, this court held that the trial court did not err in denying the motion to dismiss. *Id.* at 1088-89.

In *State v. Pomeroy*, the appellate court detailed the courts' discontinuation of the four-factor test and applied the objective reasonable person standard. *State v. Pomeroy*, 97-1258 (La. App. 5 Cir. 5/13/98), 713 So.2d 642, 645. Noting that the Louisiana Supreme Court had previously adopted the four-factor test in *State v. Thompson*, the court continued:

> Since that time the United States Supreme Court has developed an analysis which substantially undermines the four-part test previously developed by the courts. In that new analysis, the Supreme Court has separated the concept of probable cause to arrest and the subjective perceptions of either the interrogating officer or the defendant from the issue of custody. The high court has explained that the only relevant inquiry in determining whether there was a formal arrest [or] a restraint on freedom of movement of the degree associated with an arrest is 'how a reasonable man in the suspect's position would have understood [his] situation.'

*Id*. (quoting *Berkemer*, 468 U.S. at 442).

These decisions make it clear that whether a person has been deprived of his or her "freedom of action in any significant way" (per *Miranda*) or "detained" (per La. Const. Art. I, Sec. 13) is to be determined by the objective circumstances of the interaction between law enforcement and the accused. The only relevant inquiry is "how a reasonable [person] in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442. Moreover, the "subjective views harbored by either the interrogating officers or the person being questioned" have no place in a court's determination as to whether the suspect should have received Miranda warnings. *Stansbury*, 511 U.S. at 323.

In the case at bar, the defense relies on the subjective thoughts of the detectives and the defendants during the interview. Specifically, the focus is on what point the detectives learned of the most serious injuries, whether the officers

believed at the time of the interview that the child had been physically abused, and whether the officers suspected either parent of wrongdoing. These are impermissible considerations under *Stansbury*. The inquiry in this case should be how a reasonable person in John or Analise's position would have understood the situation.

The evidence presented by the State at the motion to suppress hearing shows that a reasonable person would not believe he or she was deprived of their freedom in any significant way or otherwise detained. By all accounts, the defendants were treated courteously and were not coerced by the officers. While pointed or accusatory questioning may indicate to a reasonable person that he or she is not free to leave the room, the questions asked were of a general nature. The interviews lasted a short period of time, in a neutral location, and took place near D.N.'s hospital room, which would also indicate to a reasonable person that the detectives were not attempting to deprive the parents' freedom of action in any significant way. In addition, both parents were allowed to leave the hospital room and ultimately the city at the conclusion of the interview. *See Mathiason*, 429 U.S. at 495 (determining that a suspect was not in custody where he left a 30-minute interview at the police station "without hinderance"). These circumstances do not rise to the level of a "police-dominated atmosphere" that could result in making self-incriminating statements, which would trigger Miranda warnings, nor do they rise to the level of detainment contemplated in Louisiana Constitution Article 1, Section 13. *Miranda*, 384 U.S. at 456.

### DECREE

Accordingly, for the reasons stated, we reverse the trial court's decision to suppress the statements and remand for further proceedings.

**REVERSED AND REMANDED.**

SUPREME COURT OF LOUISIANA

No. 2024-KK-01224

STATE OF LOUISIANA

VS.

JOHN NOEHL AND ANALISE NOEHL

On Supervisory Writ to the 19th Judicial District Court,
Parish of East Baton Rouge

**GUIDRY, J.,** dissents and assigns reasons.

While at the hospital with their critically injured child, the Noehls were questioned separately by detectives.  In the interview with Ms. Noehl, the detective indicates that "doctors" have questions about the child's injury.  The detective states, "the doctors think it's severe," "we need to ask the right questions so the doctors can understand."  At one point, the detective requests Ms. Noehl write out a statement. The detective tells Ms. Noehl he will be going to her home. There is no indication Ms. Noehl was told she was free to leave.

Similarly, in the interview with Mr. Noehl, the detective states, "the doctors call us…we need to ask questions."  The detective explained, "we need to get what transpired."  After Mr. Noehl expressed that he was very emotional, likely suffering PTSD, the detective continued asking questions.  There is no indication Mr. Noehl was told he was free to leave.

Under these circumstances, particularly where the Noehls were separated from their critically injured child, separated from one another, told several times that questions *needed* to be asked, and *told* by detectives that officers would be going to their home, I disagree with the majority's opinion that the interviews indicated to a reasonable person that the detectives were not attempting to deprive the parents' freedom of action in any significant way.  Appellate courts review trial court rulings under a deferential standard with regard to factual and other trial determinations,

while legal findings are subject to a de novo standard of review. *State v. Wells*, 08-2262 (La. 7/6/10), 45 So. 3d 577, 580. The State bears the burden of proving the admissibility of a purported confession or statement by the defendant when the legality of a statement is placed at issue by a motion to suppress evidence. La. C. Cr. P. art. 703(D). Given the totality of the circumstances, I would find the Noehls were in custody. I would also find their statements were made pursuant to the influence of the officers.