339 So.2d 550 (1976)
W.C. GRIFFIN
v.
STATE of Mississippi.
No. 49279.
Supreme Court of Mississippi.
November 9, 1976.
Rehearing Denied December 7, 1976.
*551 Claude A. Chamberlin, Aberdeen, for appellant.
A.F. Summer, Atty. Gen., by Billy L. Gore, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, SUGG and WALKER, JJ.
WALKER, Justice, for the Court:
W.C. Griffin was tried and convicted of felonious shoplifting under Mississippi Code Annotated section 97-23-45 (1972) in the Circuit Court of Monroe County, Mississippi. He was sentenced to a term of three years in the state penitentiary, two of which were suspended. Upon rejection of his motion for a new trial, he brings this appeal to this Court.
Griffin assigns as error the court's rejection of his motion to suppress all evidence obtained by the police from their on-the-scene search and interrogation of the appellant. This assignment presents the question of whether the circumstances constituted "custodial interrogation" so as to necessitate the giving of the warnings outlined in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). His other assignments of error have been considered and are without merit.
On November 30, 1974, Mrs. Wynette Byars, the proprietor of Panetta's store in Aberdeen, Mississippi, observed Griffin and two other males in her store. The three looked through a table of men's slacks and departed without making a purchase. Fifteen minutes later, she saw Griffin across the street in front of Bergman's store. Mrs. Byars testified, "W.C. [the defendant] was standing at the corner of Bergman's Store and one other male subject walked up with a paper bag in his hand and each of them taken out some men's slacks and put into the paper bag." On cross-examination, she admitted that she could not be certain from that distance whether the items involved actually were slacks. After this incident, Mrs. Byars called the police and reported her observations.
In response to that call, Officers Johnny Kendrick and Wallace Dobson soon appeared at Panetta's. Mrs. Byars pointed to Griffin, who was walking down the street, and the officers thereupon went to confront him. The subsequent events are best described by Officer Kendrick's testimony, which was substantially confirmed by other evidence in the case:

*552 Q. And what did you say to him when you confronted him, Officer Kendrick?
A. I asked him what he had in the bag there.
Q. What did he say?
A. He didn't say anything. He just showed it to me.
Q. What did he do, then, if he didn't answer you?
A. He just opened the bag up for me.
Q. Did he take anything out?
A. There were two pair of pants in the bag.
.....
Q. What happened next?
A. I asked him if he had a receipt for the two pair of pants he had.
Q. What did he do?
A. He didn't say anything  yes, he did. He said he  he said yes. And he pulled out his wallet and took out a layaway card.
Q. Did the layaway card have any name on it?
A. No, not that I can recollect.
Q. Did the paper bag have any store name on it?
A. No.
Q. Would you describe that bag?
A. Just a brown paper bag; it was ripped.
Q. What happened after he showed you this layaway card?
A. Well, I asked him where he did get the pants. And he didn't say nothing. Oh, yes, he did. He said he got them at a store but he didn't know the name of the store.
Q. What happened then?
A. I asked him if he would go with us to a store.
.....
Q. And did he say he would go or what did he do to indicate one way or the other?
A. When I asked the question, he started moving with me.
Q. Which way?
A. To Panetta's store.
.....
Q. What happened when you went in?
A. We confronted Mrs. Byars; she was behind the desk there; and the pants were produced on the table. And I asked her if those pants were hers.
.....
Q. And what did Mrs. Byars say about those pants?
A. She said that they weren't her pants; didn't come from the store.
Q. What happened next?
A. I seen that W.C. Griffin had something in his coat. You could see that something was bulging out of his coat that he was wearing. I asked him if he wouldn't mind taking out what he had in his coat. And he did so.
Q. What did he say or what did he do?
A. Well, he didn't say nothing. He just took it and put it on the desk there.
Q. What did he take out?
A. One pair of pants.
Q. Did Mrs. Byars look at that pair of pants?
A. Well, not right then. Mr. Dobson said to take out what he had on the other side.
.....
Q. Did he tell him to take them out?
A. No, he did not.
Q. And did W.C. Griffin take that second pair of pants out from under his coat?
A. Yes, he did.
.....
Q. Now, did Mrs. Byars look at those two pair of pants?
A. Yes.
Q. And what did she say about those?
A. She couldn't identify them as being hers.
Q. All right. What was said or what was done next?
A. Well, since she couldn't identify them as being hers, I asked him where did the pants come from.
Q. What did he say?

*553 A. He just  he started walking toward the door and we followed. He went right across the street to Bergman's.
After it was determined that the pants had come from Bergman's, Griffin was arrested and subsequently indicted for felonious shoplifting. At the time of the arrest, Officer Kendrick read Griffin the Miranda warnings for the first time. Griffin did not take the stand to present his version of the facts or to deny the account related by the officers either in the hearing on his motion to suppress or at the trial on the merits.
Griffin argues vigorously that the police had no right to stop him for questioning and that all evidence obtained as a result thereof should be excluded. We find no merit in this contention. This Court has recognized "that given reasonable circumstances an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest." Singletary v. State, 318 So.2d 873, 876 (Miss. 1975). This investigatory procedure has been approved by the Supreme Court of the United States in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Here, the suspicious circumstances observed by Mrs. Byars certainly justified the original stop.
However, Griffin further contends that the police had a duty, under these circumstances, to give him the Miranda warnings. Miranda requires that a suspect be advised of his Fifth Amendment right to silence and his Sixth Amendment right to counsel as a prerequisite to police interrogation "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Our task, then, is to determine the point at which an investigatory detention, approved by Terry, becomes a custodial interrogation so as to require that a suspect be advised of his rights.
The Supreme Court of the United States has made clear that the Miranda warnings are required whenever a suspect is actually under arrest, Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), but has given no other suggestion of their application in the infinite variety of street encounters between policemen and private citizens. However, the Court has recognized that a valid distinction does exist. In Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), a case concerning an investigatory stop involving minor traffic violations, the Court noted in dictum that "these situations are... immeasurably far removed from `custodial interrogation' where in Miranda v. Arizona, supra, we found that the Constitution required certain now familiar warnings as a prerequisite to police interrogation." Id. at 232, 93 S.Ct. at 2050, 36 L.Ed.2d at 865. Recognizing the distinction, the Court has left it to the various jurisdictions to determine under the facts of a given case whether "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."
Griffin contends that, because police had focused their investigation solely upon him, they had a duty to advise him of his rights. This concept of "focus" stems from Escobedo v. Illinois, 378 U.S. 478, 490-91, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977, 986 (1964). However, the Supreme Court has recently declared that the Escobedo rule is subsumed in the Miranda rule; the police have focused on a suspect when and only when they have taken him into their custody. Beckwith v. United States, 425 U.S. 341, 344-47, 96 S.Ct. 1612, 1615-16, 48 L.Ed.2d 1, 6-8 (1976). Therefore, the only inquiry in the case sub judice is whether, at the time the police questioned Griffin as to where he had gotten the pants, he had been "deprived of his freedom of action in any significant way."
Griffin seems almost to contend that the mere presence of police officers in an investigatory context in a street encounter is so inherently coercive as to require the delivery of the Miranda warnings. Such a *554 rule would seriously impede the necessary investigatory work of our police. It is not required by the implications of Miranda, and we decline to adopt it.
Griffin, in his brief, argues that the police are required to deliver the Miranda warnings at such time as they have probable cause for arrest. This rule has been rejected by the Supreme Court of the United States in a Sixth Amendment context:
There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to establish probable cause. (Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374, 386 (1966)).
The rule suggested by Griffin would unduly hamper police investigation, trapping them between the requirements of the Fourth and Fifth Amendments. Other possible rules are considered and rejected in LaFave, "Street Encounters" and the Constitution: Terry, Sibron, Peters and beyond, 67 Mich.L.Rev. 39, 100-06 (1968).
The whole point of Miranda was not to hinder police interrogation but to prevent coercion and intimidation of suspects to obtain confessions and admissions from them. The ultimate purpose, of course, was to preserve a defendant's right under the Fifth Amendment to the United States Constitution that he "shall [not] be compelled in any criminal case to be a witness against himself." Miranda certainly never intended that a person, even though suspected of a crime or accused of a crime, cannot voluntarily cooperate with police officers. In this case, the record shows that the police officers dealt courteously with Griffin and in no way coerced or intimidated him, unless it could be said that their mere presence during the street encounter amounted to coercion, which proposition we have already rejected.
Griffin was under no physical or verbal restraint and made no attempt to leave or terminate the interview, but rather cooperated with the officers. He was not coerced or intimidated. He was merely caught, and gave no testimony to the contrary.
We would point out that when a defendant raises the issue of custodial interrogation in a motion to suppress statements made without benefit of the Miranda warnings, the State will have made a prima facie case at the hearing that the accused was not in custody if an interrogating officer testifies that the accused was not under arrest and was under no physical or verbal restraint from leaving or terminating the interview. If the accused then fails to go forward and show an arrest, physical or verbal restraint from leaving or terminating the interview, or some other unusual circumstance indicating a deprivation of his freedom of action in some substantial way, so as to make out a question of fact to be decided by the court, then the inquiry on that issue should terminate. The accused is required to take the initiative because the prosecution and the court are entitled to know what fact or facts, if any, constituting "custody" are in controversy, so as to avoid needless expenditure of judicial time. If the defendant's evidence creates a question of fact, then the prosecution has the burden of proving that the accused was not deprived of his freedom in any significant way and, consequently, there was no custodial interrogation requiring the Miranda warnings. The determination of this question is by the court and not the jury.
In this case, the inquiry on the motion to suppress, there being no other issues, could have been terminated after the first officer testified. A prima facie case that Griffin had not been in custody had been established and the accused did not present any evidence to create a question of fact to be resolved by the court.
We conclude that the evidence derived from the interrogation of Griffin was properly *555 admitted at trial, and his conviction must be affirmed.
AFFIRMED.
GILLESPIE, C.J., PATTERSON and INZER, P. JJ., and SMITH, ROBERTSON, SUGG, BROOM and LEE, JJ., concur.