799 So.2d 890 (2001)
Gregory LINSON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2000-KA-00919-COA.
Court of Appeals of Mississippi.
November 6, 2001.
*891 John A. Howell, Picayune, for Appellant.
*892 Office of the Attorney General by Jeffrey A. Klingfuss, for Appellee.
EN BANC.
SOUTHWICK, P.J., for the Court.
¶ 1. Gregory Linson was found guilty of possession of a FIREARM by a convicted felon. On appeal he states that the principal evidence against him should have been suppressed. We disagree and affirm.

FACTS
¶ 2. Officer Wayne Drexler received a call from a confidential informant, known to Drexler and who had proven reliable in the past, that three black males were selling drugs at the intersection of Kingsway Drive and Brooksdale Drive in Picayune, Mississippi. Several arrests had been made in the past on information received from this informant. Drexler and Officer Larry Cagle went to the scene in an unmarked vehicle to investigate. The two officers drove to the area where the reported drug activity was occurring. After confirming that there were three black males at the intersection in question, the officers called Officer Shelton Farmer to meet them at a nearby parking lot to confer with them. They met with Farmer and explained to him the information they received.
¶ 3. Driving a police-marked vehicle, Farmer went to the area described by Drexler and Cagle. Farmer saw the men approach two different vehicles that arrived at the intersection, and after a brief encounter the vehicles drove away. According to the officers, this area was known for incidents of illegal drug activity. Farmer, in his clearly marked police vehicle drove up to the men, and they immediately began to walk away. Farmer, in uniform, exited his vehicle and asked them to stop. Two of the men did as Farmer asked, returned to his car and placed their hands on the patrol car. Linson did not respond to Farmer's request. Instead, he walked toward the nearby apartment building. According to Farmer, Linson appeared very nervous as he paced near the building.
¶ 4. Officers Drexler and Cagle arrived on the scene. Drexler tended to the two men at the police car while Farmer asked Linson a second time to approach the car. According to Farmer, Linson began to walk around his right side. Farmer put his hand up in front of Linson and requested that he put his hands on the car. Farmer testified that Linson pushed him backwards and began to run. Farmer grabbed him, wrestled him to the ground, and then received assistance from the other two officers. As Farmer handcuffed Linson, Cagle made a "cursory check" of him and discovered and removed a .22 caliber revolver from Linson's pants pocket. Cagle indicated that the search occurred after Linson was in handcuffs.
¶ 5. Linson was indicted on the charges of possession of a firearm by a convicted felon. Linson submitted a pre-trial motion requesting suppression of the weapon. The trial court heard the testimony of all three officers before trial. In denying the motion, the trial court found that the information received by Officer Drexler was not an anonymous tip but was from a reliable confidential informant. The court determined that after the men had been seen in the location described by the informant and approaching cars for brief meetings, Farmer had the right to question them. Linson refused to comply with Farmer's request, giving the officer the right to use such force as was necessary to subdue him. The court found that Linson's actions entitled the officers to search Linson prior to transporting him on the misdemeanor charges of refusing to obey the officer's *893 commands. The suppression motion was denied.

DISCUSSION
¶ 6. Linson argues that his arrest for disorderly conduct was unlawful because there were no indications that he had or was about to breach the peace, an essential element of the crime of disorderly conduct. As such, he maintains that the subsequent search of his person was illegal. Even further, he contends that the firearm found on him resulted from an illegal search.
¶ 7. To make an arrest without a warrant, an officer must have probable cause that an offense has been committed. The probable cause is "determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. The determination depends upon the particular evidence and circumstances of the individual cases." Smith v. State, 386 So.2d 1117, 1119 (Miss.1980). Yet even before an arrest, officers have a right to investigate.
¶ 8. Law enforcement officers may make an investigative stop, which is a detention of a person short of an arrest. McCray v. State, 486 So.2d 1247, 1249 (Miss.1986). Such a stop may be made even where officers have no probable cause to make an arrest, so long as they have "a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony... or `some objective manifestation that the person stopped is, or is about to be engaged in criminal activity....'" McCray, 486 So.2d at 1249-50. In addition, "an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest." Estes v. State, 533 So.2d 437, 441 (Miss.1988) (quoting Griffin v. State, 339 So.2d 550, 553 (Miss.1976)). Reasonable suspicion is all that is required to stop and frisk. Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
¶ 9. During an investigatory stop, a law enforcement officer may properly "conduct a weapons search limited in scope" for the discovery of concealed weapons. Singletary v. State, 318 So.2d 873, 877 (Miss.1975). An investigative stop is not unlimited in scope and must not approach the point where the detention becomes a seizure. Id. The stop may then lead to probable cause to arrest.
¶ 10. Once an arrest has occurred, a search incident to it may occur. Such a search is based on the principle that the person detained may have a weapon on his person or within reach, or that the accused may try to destroy nearby evidence. White v. State, 735 So.2d 221, 224 (Miss.1999).
¶ 11. The key question, then, is whether reasonable suspicion existed that justified an officer's approaching Linson and the other two suspects. One of these officers had been given information by a confidential informant who had been reliable in the past, that there were three men in a particular location selling illegal drugs. That location was said by the officers at trial to be part of a four block area that was frequently used to sell drugs. The United States Supreme Court held "that an unverified tip from a known informant might not have been reliable enough to establish probable cause, but nevertheless [the Court] found it sufficiently reliable to justify a Terry stop." Neely v. State ex rel. Tate County, 628 So.2d 1376, 1379 (Miss.1993), citing Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Applying that rationale, the Mississippi Supreme Court found that a tip from a proven reliable *894 confidential informant could constitute reasonable suspicion:
In the case sub judice the tip came from a known informant and the information supplied by this [confidential informant] had been successfully used by the officer in the past. Based on his previous dealings with this [informant, officer] Hulette had reason to believe that the information the [informant] provided about Neely was true. Under those circumstances, the tip alone provided the necessary indicia of reliability to justify the stop because it came from a confidential informant, whose dealings with the officer had shown him to be honest and reliable.
Neely, 628 So.2d at 1379.
¶ 12. When police have been given reliable information of criminal conduct, this justifies a detention less intrusive than an arrest. "`Consideration of the constitutionality of seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" Floyd v. City of Crystal Springs, 749 So.2d 110, 117 (Miss.1999), quoting Brown v. Texas, 443 U.S. 47, 50-51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). As these precedents explain, the balance has been to allow brief investigatory stops for questioning when reasonable suspicion arises.
¶ 13. In Floyd, a police dispatcher was told that an automobile of a specific description and location was being driven recklessly. This justified a stop when an identical vehicle was seen.
Reasonable cause for an investigatory stop may be based on an officer's personal observation or on an informant's tip if it bears indicia of reliability. Adams v. Williams, 407 U.S. at 147, 92 S.Ct. at 1924. Reasonable suspicion is dependent upon both the content of the information possessed by the detaining officer as well as its degree of reliability. Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). Both factorsquantity and qualityare considered in the "totality of the circumstances." Id.

Floyd, 749 So.2d at 118.
¶ 14. The dissent here says that this tip was not reliable and focuses as much on what the officers learned after the stop and friskno drugs were foundas what they knew beforehand. What was learned after the stop and frisk is irrelevant. Police work is not usually about certainties. Here it concerned reasonable suspicions. The United States Supreme Court has quite recently reaffirmed the distinction between tips received from known and unknown informants:
In the instant case, the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see Adams v. Williams, 407 U.S. 143, 146-147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," Alabama v. White, 496 U.S., at 329, 110 S.Ct. 2412, 110 L.Ed.2d 301.
Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). As to Linson's stop, the person providing the tip was known. Though the record does not reveal the person's name, the authorities knew who it was. The kind of informant accountability being discussed in Adams v. Williams was that the relevant state's law *895 made a false complaint a crime. Adams, 407 U.S. at 147, 92 S.Ct. 1921. That is a crime in Mississippi today under a statute that only became effective in 2000. Miss. Code Ann. § 97-35-47 (Rev. 2000).
¶ 15. Yet it is hard to deny that some greater incentives for being truthful exist for the known informant compared to the anonymous tipster. If nothing else, the known informant who does not immediately disappear when the telephone connection ends likely has no certainty about whether a knowingly false report may either be punishable under state law or sanctionable in some other way. A "face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir.1991). Though the informant in our case did not apparently appear in person, knowledge of the identity of the informant serves the same purpose. In fact, the dissent in Salazar identified an informant such as involved here as being an especially reliable source for information.
Whether an anonymous tip is delivered in person or over the telephone wires has little if any impact on the reliability of the tip. Whereas, whether the police will have future dealings with the tipster, and thus whether the tipster has a stake in the veracity of the information, is a true gauge of reliability.

Id. at 53 (Oakes, C.J., dissenting) (emphasis added), quoted with approval in Burger v. Rattigan, 974 F.2d 1340 (7th Cir.1992) (Table).
¶ 16. To leave the details, we summarize by noting that whether reasonable suspicions exist is a matter judged from the totality of the circumstances. Alabama v. White, 496 U.S. 325, 328-29, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The officers had received a tip from a known informant who had been reliable in the past, that three black males were at a certain corner selling drugs. They went to the corner and saw the three men twice approach automobiles. The officers did not see drugs in the possession of the three men, but the officers testified that what they saw was consistent with drug activity. One officer explained without naming the person, that the informant was in a particularly good vantage point to see the activity, while it appears that the officers were watching from some distance away. The dissent may be correct that what the officers themselves observed also was consistent with innocent socializing. But the suspicions remained reasonable. Therefore, under the totality of the circumstances the officers here were justified in conducting an investigatory stop of Linson and the other two individuals.
¶ 17. With all respect for the dissenter and the dissenting opinion, this was not suspicious police conduct applied to random people based on inappropriate factors. Instead this was entirely appropriate police conduct based on reasonable suspicions created by the most unrandom factor of having received a tip from someone who had been reliable in the past. Then the police confirmed as best as the situation permitted, not by seeing these males just standing on the corner, but seeing the individuals go several steps beyond that by approaching passing automobiles.
¶ 18. The officers still did not have probable cause to believe that drug sales were occurring, but they knew enough to investigate. Officer Farmer sought to speak to the three to determine what they were doing at the intersection. Two complied with his directions. Linson, however, refused his request and attempted to walk past Farmer. Officer Farmer put his *896 hand up in front of Linson and again asked him to stop. According to Farmer, "[a]t that point he pushed me backwards and began to take off to run.... I grabbed ahold of him and was wrestling him to the ground when Cagle and Drexler both came up." Linson hit the officer in the shoulder and tried to push him away. After Farmer was able to restrain Linson, Officer Cagle made a cursory pat down. It uncovered the .22 caliber revolver in Linson's pants pocket.
¶ 19. The officers were acting within the scope of their authority in detaining Linson. If a person refuses to submit to a valid investigatory stop, officers have the right to use reasonable means to force compliance. Boches v. State, 506 So.2d 254, 264 (Miss.1987) (officers can pursue and briefly detain vehicle that evaded roadblock). Here, the investigatory stop and frisk were justified based on the information received from a reliable informant and from what the officers witnessed. When Linson refused, pushed the officer away, and attempted to run, Farmer could seek to restrain him. Even without commission of a misdemeanor of refusing to obey lawful commands, Linson could have been frisked for weapons as part of being forced to submit to the investigatory stop.
¶ 20. The discovery and seizure of the revolver were proper. We find no error in the trial court's decision in refusing to suppress the evidence.
¶ 21. THE JUDGMENT OF THE PEARL RIVER COUNTY CIRCUIT COURT OF CONVICTION OF POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF THREE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS AN HABITUAL OFFENDER IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PEARL RIVER COUNTY.
McMILLIN, C.J., BRIDGES, THOMAS, LEE, MYERS, and BRANTLEY, JJ., concur.
IRVING, J., dissents with separate written opinion joined by KING, P.J., and CHANDLER, J.
IRVING, J., dissenting:
¶ 22. On the facts of this case, I do not believe the officers had the authority to make either an investigative stop or an arrest. Therefore, I dissent.
¶ 23. The majority holds that the investigative stop was justified because of what the officers witnessed and the information conveyed by a confidential informant. As to what the officers witnessed, the record reflects that one officer in a marked police car went to the area of the intersection and observed three black males standing on one of the corners of the intersection. Two different vehicles arrived at the intersection, and the individuals approached the vehicles. Shortly thereafter, the vehicles drove away. The reliable confidential informant had said the individuals were selling drugs at the intersection, but no drugs were found.
¶ 24. There are any number of legal things that these three black males could have been doing at the intersection; therefore, I cannot agree that the officers had either probable cause or reasonable suspicion to stop or arrest them. For example, there could have been a surprise birthday party going on at the apartment, and the individuals were stopping persons to give instructions where to park to prevent the honoree from discovering the surprise. The three individuals certainly had a First Amendment right to freedom of assembly, and that right does not circumscribe where *897 they may congregate so long as they are not committing a trespass.
¶ 25. According to the testimony of Investigator Drexler on the motion to suppress, he received information from a reliable confidential informant that the three individuals were stopping cars at the entrance to Kingsway Apartments and selling drugs and that the confidential informant did not believe the individuals were residents of the apartment complex. Drexler further testified that, according to the confidential informant, the individuals were standing in an area posted with no loitering signs and appeared to be trespassing on the property. It is interesting to note, however, that neither of the individuals was charged with loitering nor trespass. If in fact they were trespassing, this would have provided a proper basis for arresting them. Further, it appears that the individuals were not trespassing. This is what Officer Cagle testified to on the motion to suppress:
Q. And you didn't observe any violation of law by any of these people up until this allegation that Mr. Linson ran or tried to exercise his right not to cooperate?
A. We werewe came into the area intentionally to act on the information that was provided by Drexler's source. We contacted Farmer (a fellow police officer) and then at that point we acted on what he observed and what he was doing at that point. But as far as seeing Mr. Linson or anyone else doing anything initially or where I would make arrest myself, no, I did not. Other than when he pushed Officer Farmer and then subsequently
* * * *
Q. And no drugs were found?
A. No, sir.
Q. Did you see anyone commit an offense in your presence?
A. That's a difficult question to answer.
Q. Other than what you claim, you're going to claim is an offense by Mr. Linson by trying to walk away, did you see any other illegal activity?
A. No, sir.
¶ 26. I will agree that the individuals' conduct was consistent, in part, with the modus operandi of street drug peddlers. However, since no one saw the individuals pass anything to any of the occupants of the cars that stopped, their conduct, in my opinion, was also consistent with other innocent activity. If something was being exchanged between the individuals and the occupants of the cars, maybe that conduct would be suspicious enough to justify an investigative stop, but that was not the case.
¶ 27. Moreover, when Officer Farmer, the officer in the marked police car, arrived at the location of the individuals, they had already moved from the spot where the confidential informant reported they were. This is what Officer Farmer said:
Q. Okay. Then what happened when you got there?
A. They had already walked back to the entrance way of Kingsway Drive whenever I pulled up. I pulled up right in front of them. I got out of the vehicle. At that point they started to turn around and disburse.
* * * *
Whenever I got out on them, they walkseparating and walk off. At that point I told them to stop, turn around and come back, which two of them came back. I asked them to place their hands on the car. At that point Mr. Linson had walked over closer to one of the apartments on the *898 left side of the entrance and appeared to be very nervous, walking back and forth.
¶ 28. It appears clear to me that Linson was arrested because he simply exercised his constitutional right not to talk to the officers. In my judgment, on these facts, he had a right to do just that. As stated, I do not believe that there was sufficient evidence to justify either an investigative stop or an arrest.
¶ 29. The majority places great weight, as indeed they must, on what Officer Cagle said the confidential informant reported to him. In the typical situation, information reported by a confidential informant would be reduced to writing and related to a detached magistrate who would decide whether the information was credible enough to issue a search warrant for a specific location or an arrest warrant for a specific individual. Since these individuals were subject to leaving the scene at any moment, it is understandable that the informant's information could not be scrutinized first by a judicial officer to determine if there was sufficient information to issue an arrest warrant. Therefore, in situations like this one, the question is: Did the law enforcement officer, in checking out the information known to him, act reasonably in stopping the individual or vehicle?
¶ 30. I want to be clear. I do not take issue with the well-settled law in this state that in a proper situation, law enforcement officers may make an investigative stop and temporarily detain a person for the limited purpose of checking out a complaint or tip. Neither do I take issue with the majority's statement that a confidential informant's tip can be sufficient to justify an investigative stop short of an arrest. What I do take issue with is whether this tipwhich did not contain any specific and unique information capable of being known only to the informant and those associated with the criminal activitywas sufficient to justify the search.
¶ 31. The majority cites Neely v. State ex rel. Tate County, 628 So.2d 1376 (Miss. 1993), and Floyd v. City of Crystal Springs, 749 So.2d 110 (Miss.1999), for the proposition that a tip from a proven reliable confidential informant can constitute reasonable suspicion sufficient to justify an investigative stop. That is true, depending on the nature of the tip. I do not read either of these cases to stand for the blanket proposition that every tip from a reliable confidential informant constitutes reasonable suspicion to justify an investigative stop. Each tip must be examined in the context of the totality of the circumstances of the case.
¶ 32. In Neely, Deputy Hulette of the Tate County Sheriffs Department received a telephone call from a confidential informant that "Neely was dealing crack and that Neely would be making a delivery that night. The CI also told Hulette that Neely would be travelling east on Arkabutla Road with crack in his vehicle." Neely, 628 So.2d at 1377. Officer Hulette went to Arkabutla Road and spotted Neely traveling along Arkabutla Road just as the CI said he would be. Id.
¶ 33. In deciding that Officer Hulette, relying on the CI's tip, acted properly in stopping Neely, our supreme court said, "The issue here is whether the information provided by the CI was sufficient under the interpretation of the Fourth and Fourteenth Amendments to the U.S. Constitution, as most recently pronounced in Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)." Id. at 1379. The court then recited the pertinent White facts as follows:
In White, there was information from an anonymous source that a certain person, the defendant, would leave a certain *899 place, at a certain time carrying an ounce of cocaine in a brown attache case and drive a particular vehicle to a certain destination. The officers went to the point of departure and observed the defendant leave and embark upon the most direct route to the alleged designation whereupon they stopped the vehicle.
Id.
¶ 34. Following the recitation of the relevant facts in White, the Mississippi Supreme Court opined:
It is clear that White controls here. In fact, the officer in the case sub judice could have stopped Neely on the basis of the tip alone without any independent police corroboration.... In the case sub judice, the tip came from a known informant and the information supplied by this CI had been successfully used by the officer in the past. Based on his previous dealings with this CI, Hulette had reason to believe that the information the CI provided about Neely was true. Under those circumstances, the tip alone provided the necessary indicia of reliability to justify the stop because it came from a confidential informant, whose dealings with the officer had shown him to be honest and reliable. However, we will assume that the CI's tip did not rise to the necessary level of reliability to justify the stop. Thus, it becomes necessary to consider whether the stop could be sustained on the basis of the tip, as corroborated with the officer's independent police work. Here, the CI told the officer that Neely was travelling in a certain direction on a certain road and that Neely was headed out of town to sell the crack. Since the officer knew Neely, he apparently knew what kind of car Neely would be driving. Acting on the CI's tip, the officer went to Arkabutla Road. Shortly thereafter, he spotted Neely who was travelling in the direction that the CI said he would be travelling. As the White Court pointed out, what was significant was the CI's ability to predict Neely's future behavior, because it demonstrated inside informationa special familiarity with Neely's affairs. White, 496 U.S. at 332, 110 S.Ct. at 2417. Thus, the officer's independent police work coupled with the tip exhibited sufficient indicia of reliability to justify the investigatory stop.
Id. at 1379-80 (emphasis added).
¶ 35. The emphasized portion of the text quoted above illustrates that it is both the nature of the tip as well as the reliability of the informant that makes the tip legally sufficient to justify the investigatory stop. In other words, if the tip itself "bears indicia of reliability" and comes from a reliable confidential informant, nothing more is required to justify the investigatory stop. However, if the tip comes from a confidential informant but the tip itself does not bear indicia of reliability, that is, does not contain inside information indicating a special familiarity with the affairs of the person to be stopped, corroboration on the part of the officer is required.
¶ 36. Floyd v. City of Crystal Springs, 749 So.2d 110 (Miss.1999), cited by the majority, does not support the majority's contention that the only requirement for making an investigatory stop is a tip from a confidential informant. The majority quotes the following from Floyd:
Reasonable cause for an investigatory stop may be based on an officer's personal observation or on an informant's tip if it bears indicia of reliability. Adams v. Williams, 407 U.S. at 147, 92 S.Ct. at 1924. Reasonable suspicion is dependent upon both the content of the information possessed by the detaining officer as well as its degree of reliability. *900 Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412,2416, 110 L.Ed.2d 301(1990). Both factorsquantity and qualityare considered in the "totality of the circumstances."
Majority Opinion at (¶ 13) (emphasis added). The italicized portion of the passage quoted above makes clear that if the officer is acting on the informant's tip alone, the tip must bear indicia of reliability.
¶ 37. In Floyd, Floyd was convicted of DUI after he was stopped on a tip provided by David Rogers, a citizen who had made complaints to Officer Leflore before. Floyd, 749 So.2d at 112(¶ 4). Rogers approached Officer Gerome Leflore of the Crystal Springs Police Department at a gas station on Highway 27 and told him that an antique model red Mustang convertible, traveling at a high rate of speed in a reckless manner, was headed into town on Highway 51. Id. Because Officer Leflore was off duty at the time, he called the information in to the Crystal Springs Police Department which dispatched Officer Palmer to the intersection of Highway 27 and Highway 51. Id. Palmer saw a vehicle fitting the description and ultimately stopped it. Id.
¶ 38. Again, the obvious distinction between the tip in our case and tip in Floyd is the uniqueness of the information in Floyd, that is, an antique model red Mustang convertible, and the generalness of the information here, that is three black males. Moreover, the tip in Floyd came from a citizen, not a paid informant, and was made in person. "A person who is not connected with the police or who is not a paid informant is inherently trustworthy when he advises the police a crime is being committed." Id. at (¶ 32) (quoting United States v. Sierra-Hernandez, 581 F.2d 760 (9th Cir.1978)).
¶ 39. In an attempt to boost its position that law enforcement personnel are justified in relying on a tip from a confidential informant simply because the tip comes from a confidential informant, the majority cites the case of Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). The majority quotes a passage from J.L. which indicates that a confidential informant can be held responsible if his tip turns out to be fabricated. Majority Opinion at (¶ 14). Apparently, the majority reasons that that fact somehow creates all the necessary indicia of reliability. In my judgment, such a construction of J.L. is much too broad. In fact, I see nothing in J.L. that supports the majority's position on this issue.
¶ 40. In J.L., "an anonymous caller reported to the Miami Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." J.L., 529 U.S. at 268, 120 S.Ct. 1375. Nothing was known about the informant. Id. "Sometime after the police received the tip, two officers responded." Id. "They arrived at the bus stop about six minutes later and saw three black males `just hanging out [there].'" J.L., 529 U.S. at 268, 120 S.Ct. 1375. "One of the three, J.L., was wearing a plaid shirt. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements. One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket." Id.
¶ 41. In holding that the officers were not justified in frisking J.L., the United States Supreme Court framed the issue and stated its conclusion this way: "The question presented in this case is whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person. We hold that it is not." Id.
*901 ¶ 42. The majority apparently mis-evaluates the dissent's observation that no cocaine was found on Linson or anyone else. I am well aware that it is not what the officers find or fail to find, after the fact, that is the focal point of the inquiry into whether the stop is justified. As stated, I do not take issue with the fact that a credible confidential informant's tip, without corroboration from an officer, may, in some instances, form the basis for an investigatory stop. This is simply not that kind of tip. As the Unites States Supreme Court said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), a case involving a tip from a confidential informant, "[i]nformants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simply [sic] rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized."
¶ 43. Adams was one of the first cases to discuss the reliability of confidential informants. In Adams, "Police Sgt. John Connolly was alone early in the morning on car patrol duty in a high-crime area of Bridgeport, Connecticut. At approximately 2:15 a.m., a person known to Sgt. Connolly approached his cruiser and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." Id. at 144-145, 92 S.Ct. 1921. Sgt. Connolly approached the vehicle to investigate the informant's report. Id. at 145, 92 S.Ct. 1921. He tapped on the window and asked the occupant, Robert Williams to open the door. Id. When Williams rolled down the window instead, Connolly reached into the car and removed a fully loaded revolver from Williams's waistband. Id. The gun had not been visible from outside the car, but it was in precisely the place indicated by the informant. Id.
¶ 44. In discussing the reliability of the confidential informant issue, the Adams court said this:
The informant here came forward personally to give information that was immediately verifiable at the scene. Indeed, under Connecticut law, the informant might have been subject to immediate arrest for making a false complaint had Sgt. Connolly's investigation proved the tip incorrect.

Id. at 147, 92 S.Ct. 1921. (emphasis added).
¶ 45. The majority acknowledges that at the time of Linson's arrest Mississippi's law was not comparable to Connecticut's regarding penalties for making false criminal complaints to law enforcement. However, the majority still attempts to boost its position that the required indicia of reliability is inherent in all information supplied by a known informant because he may expect to pay some penalty if his information turns out to be false. I do not doubt or take issue with the assertion that information supplied by a known informant is likely to be more credible than an unknown telephone tipster. That is simply not the issue here. The issue here is whether this tip was sufficient to justify the search of Linson simply because it came from a known informant who had given reliable information in the past. The majority argues that it was sufficient because nothing more is ever required when the tip comes from such an informant. I say this position is not supported by the case law, and that the actions taken by law enforcement personnel acting on tips, even tips coming from reliable confidential informants, must be evaluated in light of the totality of the circumstances. As previously stated in my quote from Adams, "tips, like all other clues and evidence coming to *902 a policeman on the scene, may vary greatly in their value and reliability."
¶ 46. Unlike the majority, I do not believe that either White, Neely or Floyd stands for the proposition that any tip from a reliable confidential informant will justify an investigatory stop. The difference between the tip here and the tips in White, Neely and Floyd is that here the tip contained no unique inside information indicating a "special familiarity with the affairs of the defendant," while in White, Neely, and Floyd such was the case. Indeed, here, the confidential informant did not even identify any of the individuals by name or other distinguishing features. Also, the informant did not give any specifics undergirding her conclusion that the individuals were selling drugs. In the case sub judice, the three black males could have been any three black males, and there is no way to know whether the three black males that Officer Farmer stopped were in fact the same three black males the informant said she saw. This was not the case with the defendants that were stopped in White, Neely and Floyd.
¶ 47. In our case, the officers had only generic information. It is unfortunate, but there is nothing unique about black males standing on a street corner. As stated, one of the officers had been told that the individuals were selling drugs; however, nothing that the officers saw indicated that was the case. I reiterate, if the officers had seen something pass between the individuals on the street and the occupants of the two cars that stopped, maybe that conduct would be suspicious enough to justify an investigative stop. According to Farmer's testimony, he was told only that three black males were standing on the corner. Cagle testified that the informant told him that the individuals were selling drugs. We cannot know whether the informant simply assumed as much because she saw the three individuals standing on the corner, or whether she had personal knowledge that drug dealings were taking place. Since the informant did not tell the officer the basis for her conclusion that drugs were being sold and since no drugs were found, it is a reasonably safe bet that the informant simply assumed that drug transactions were occurring.
¶ 48. In my judgment, the search of Linson was illegal, and the weapon should have been suppressed. For these reasons, I respectfully dissent.
KING, P.J., and CHANDLER, J., join this separate opinion.