¶ 1. Gregory Linson was found guilty of possession of a firearm by a convicted felon. On appeal he states that the principal evidence against him should have been suppressed. We disagree and affirm.
 FACTS
¶ 2. Officer Wayne Drexler received a call from a confidential informant, known to Drexler and who had proven reliable in the past, that three black males were selling drugs at the intersection of Kingsway Drive and Brooksdale Drive in Picayune, Mississippi. Several arrests had been made in the past on information received from this informant. Drexler and Officer Larry Cagle went to the scene in an unmarked vehicle to investigate. The two officers drove to the area where the reported drug activity was occurring. After confirming that there were three black males at the intersection in question, the officers called Officer Shelton Farmer to meet them at a nearby parking lot to confer with them. They met with Farmer and explained to him the information they received.
¶ 3. Driving a police-marked vehicle, Farmer went to the area described by Drexler and Cagle. Farmer saw the men approach two different vehicles that arrived at the intersection, and after a brief encounter the vehicles drove away. According to the officers, this area was known for incidents of illegal drug activity. Farmer, in his clearly marked police vehicle drove up to the men, and they immediately began to walk away. Farmer, in uniform, exited his vehicle and asked them to stop. Two of the men did as Farmer asked, returned to his car and placed their hands on the patrol car. Linson did not respond to Farmer's request. Instead, he walked toward the nearby apartment building. According to Farmer, Linson appeared very nervous as he paced near the building.
¶ 4. Officers Drexler and Cagle arrived on the scene. Drexler tended to the two men at the police car while Farmer asked Linson a second time to approach the car. According to Farmer, Linson began to walk around his right side. Farmer put his hand up in front of Linson and requested that he put his hands on the car. Farmer testified that Linson pushed him backwards and began to run. Farmer grabbed him, wrestled him to the ground, and then received assistance from the other two officers. As Farmer handcuffed Linson, Cagle made a "cursory check" of him and discovered and removed a .22 caliber revolver from Linson's pants pocket. Cagle indicated that the search occurred after Linson was in handcuffs.
¶ 5. Linson was indicted on the charges of possession of a firearm by a convicted felon. Linson submitted a pre-trial motion requesting suppression of the weapon. The trial court heard the testimony of all three officers before trial. In denying the motion, the trial court found that the information received by Officer Drexler was not an anonymous tip but was from a reliable confidential informant. The court determined that after the men had been seen in the location described by the informant and approaching cars for brief meetings, Farmer had the right to question them. Linson refused to comply with Farmer's request, giving the officer the right to use such force as was necessary to subdue him. The court found that Linson's actions entitled the officers to search Linson prior to transporting him on the misdemeanor charges of refusing to obey the officer's *Page 893 
commands. The suppression motion was denied.
 DISCUSSION
¶ 6. Linson argues that his arrest for disorderly conduct was unlawful because there were no indications that he had or was about to breach the peace, an essential element of the crime of disorderly conduct. As such, he maintains that the subsequent search of his person was illegal. Even further, he contends that the firearm found on him resulted from an illegal search.
¶ 7. To make an arrest without a warrant, an officer must have probable cause that an offense has been committed. The probable cause is "determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act. The determination depends upon the particular evidence and circumstances of the individual cases." Smith v. State, 386 So.2d 1117, 1119 (Miss. 1980). Yet even before an arrest, officers have a right to investigate.
¶ 8. Law enforcement officers may make an investigative stop, which is a detention of a person short of an arrest. McCray v. State,486 So.2d 1247, 1249 (Miss. 1986). Such a stop may be made even where officers have no probable cause to make an arrest, so long as they have "a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony . . . or `some objective manifestation that the person stopped is, or is about to be engaged in criminal activity. . . .'"McCray, 486 So.2d at 1249-50. In addition, "an officer may stop and detain a person to resolve an ambiguous situation without having sufficient knowledge to justify an arrest." Estes v. State, 533 So.2d 437, 441 (Miss. 1988) (quoting Griffin v. State, 339 So.2d 550, 553 (Miss. 1976)). Reasonable suspicion is all that is required to stop and frisk.Terry v. Ohio, 392 U.S. 1, 27 (1968).
¶ 9. During an investigatory stop, a law enforcement officer may properly "conduct a weapons search limited in scope" for the discovery of concealed weapons. Singletary v. State, 318 So.2d 873, 877 (Miss. 1975). An investigative stop is not unlimited in scope and must not approach the point where the detention becomes a seizure. Id. The stop may then lead to probable cause to arrest.
¶ 10. Once an arrest has occurred, a search incident to it may occur. Such a search is based on the principle that the person detained may have a weapon on his person or within reach, or that the accused may try to destroy nearby evidence. White v. State, 735 So.2d 221, 224 (Miss. 1999).
¶ 11. The key question, then, is whether reasonable suspicion existed that justified an officer's approaching Linson and the other two suspects. One of these officers had been given information by a confidential informant who had been reliable in the past, that there were three men in a particular location selling illegal drugs. That location was said by the officers at trial to be part of a four block area that was frequently used to sell drugs. The United States Supreme Court held "that an unverified tip from a known informant might not have been reliable enough to establish probable cause, but nevertheless [the Court] found it sufficiently reliable to justify a Terry stop." Neely v. Stateex rel. Tate County, 628 So.2d 1376, 1379 (Miss. 1993), citing Adams v.Williams, 407 U.S. 143, 147 (1972). Applying that rationale, the Mississippi Supreme Court found that a tip from a proven reliable *Page 894 
confidential informant could constitute reasonable suspicion:
 In the case sub judice the tip came from a known informant and the information supplied by this [confidential informant] had been successfully used by the officer in the past. Based on his previous dealings with this [informant, officer] Hulette had reason to believe that the information the [informant] provided about Neely was true. Under those circumstances, the tip alone provided the necessary indicia of reliability to justify the stop because it came from a confidential informant, whose dealings with the officer had shown him to be honest and reliable.
Neely, 628 So.2d at 1379.
¶ 12. When police have been given reliable information of criminal conduct, this justifies a detention less intrusive than an arrest. "`Consideration of the constitutionality of seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" Floyd v. City of CrystalSprings, 749 So.2d 110, 117 (Miss. 1999), quoting Brown v. Texas,443 U.S. 47, 50-51 (1979). As these precedents explain, the balance has been to allow brief investigatory stops for questioning when reasonable suspicion arises.
¶ 13. In Floyd, a police dispatcher was told that an automobile of a specific description and location was being driven recklessly. This justified a stop when an identical vehicle was seen.
 Reasonable cause for an investigatory stop may be based on an officer's personal observation or on an informant's tip if it bears indicia of reliability. Adams v. Williams, 407 U.S. at 147, 92 S.Ct. at 1924. Reasonable suspicion is dependent upon both the content of the information possessed by the detaining officer as well as its degree of reliability. Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990). Both factors — quantity and quality — are considered in the "totality of the circumstances." Id.
Floyd, 749 So.2d at 118.
¶ 14. The dissent here says that this tip was not reliable and focuses as much on what the officers learned after the stop and frisk — no drugs were found — as what they knew beforehand. What was learned after the stop and frisk is irrelevant. Police work is not usually about certainties. Here it concerned reasonable suspicions. The United States Supreme Court has quite recently reaffirmed the distinction between tips received from known and unknown informants:
 In the instant case, the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see Adams v. Williams, 407 U.S. 143, 146-147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," Alabama v. White, 496 U.S., at 329, 110 S.Ct. 2412.
Florida v. J.L., 529 U.S. 266, 270 (2000). As to Linson's stop, the person providing the tip was known. Though the record does not reveal the person's name, the authorities knew who it was. The kind of informant accountability being discussed in Adams v. Williams was that the relevant state's law *Page 895 
made a false complaint a crime. Adams, 407 U.S. at 147. That is a crime in Mississippi today under a statute that only became effective in 2000. Miss. Code Ann. § 97-35-47 (Rev. 2000).
¶ 15. Yet it is hard to deny that some greater incentives for being truthful exist for the known informant compared to the anonymous tipster. If nothing else, the known informant who does not immediately disappear when the telephone connection ends likely has no certainty about whether a knowingly false report may either be punishable under state law or sanctionable in some other way. A "face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." United States v.Salazar, 945 F.2d 47, 50-51 (2d Cir. 1991). Though the informant in our case did not apparently appear in person, knowledge of the identity of the informant serves the same purpose. In fact, the dissent in Salazar
identified an informant such as involved here as being an especially reliable source for information.
 Whether an anonymous tip is delivered in person or over the telephone wires has little if any impact on the reliability of the tip. Whereas, whether the police will have future dealings with the tipster, and thus whether the tipster has a stake in the veracity of the information, is a true gauge of reliability.
Id. at 53 (Oakes, C.J., dissenting) (emphasis added), quoted with approval in Burger v. Rattigan, 974 F.2d 1340 (7th Cir. 1992) (Table).
¶ 16. To leave the details, we summarize by noting that whether reasonable suspicions exist is a matter judged from the totality of the circumstances. Alabama v. White, 496 U.S. 325, 328-29 (1990). The officers had received a tip from a known informant who had been reliable in the past, that three black males were at a certain corner selling drugs. They went to the corner and saw the three men twice approach automobiles. The officers did not see drugs in the possession of the three men, but the officers testified that what they saw was consistent with drug activity. One officer explained without naming the person, that the informant was in a particularly good vantage point to see the activity, while it appears that the officers were watching from some distance away. The dissent may be correct that what the officers themselves observed also was consistent with innocent socializing. But the suspicions remained reasonable. Therefore, under the totality of the circumstances the officers here were justified in conducting an investigatory stop of Linson and the other two individuals.
¶ 17. With all respect for the dissenter and the dissenting opinion, this was not suspicious police conduct applied to random people based on inappropriate factors. Instead this was entirely appropriate police conduct based on reasonable suspicions created by the most unrandom factor of having received a tip from someone who had been reliable in the past. Then the police confirmed as best as the situation permitted, not by seeing these males just standing on the corner, but seeing the individuals go several steps beyond that by approaching passing automobiles.
¶ 18. The officers still did not have probable cause to believe that drug sales were occurring, but they knew enough to investigate. Officer Farmer sought to speak to the three to determine what they were doing at the intersection. Two complied with his directions. Linson, however, refused his request and attempted to walk past Farmer. Officer Farmer put his *Page 896 
hand up in front of Linson and again asked him to stop. According to Farmer, "[a]t that point he pushed me backwards and began to take off to run. . . . I grabbed ahold of him and was wrestling him to the ground when Cagle and Drexler both came up." Linson hit the officer in the shoulder and tried to push him away. After Farmer was able to restrain Linson, Officer Cagle made a cursory pat down. It uncovered the .22 caliber revolver in Linson's pants pocket.
¶ 19. The officers were acting within the scope of their authority in detaining Linson. If a person refuses to submit to a valid investigatory stop, officers have the right to use reasonable means to force compliance. Boches v. State, 506 So.2d 254, 264 (Miss. 1990) (officers can pursue and briefly detain vehicle that evaded roadblock). Here, the investigatory stop and frisk were justified based on the information received from a reliable informant and from what the officers witnessed. When Linson refused, pushed the officer away, and attempted to run, Farmer could seek to restrain him. Even without commission of a misdemeanor of refusing to obey lawful commands, Linson could have been frisked for weapons as part of being forced to submit to the investigatory stop.
¶ 20. The discovery and seizure of the revolver were proper. We find no error in the trial court's decision in refusing to suppress the evidence.
¶ 21. THE JUDGMENT OF THE PEARL RIVER COUNTY CIRCUIT COURT OFCONVICTION OF POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCEOF THREE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OFCORRECTIONS AS AN HABITUAL OFFENDER IS AFFIRMED. ALL COSTS OF THIS APPEALARE ASSESSED TO PEARL RIVER COUNTY.
McMILLIN, C.J., BRIDGES, THOMAS, LEE, MYERS, AND BRANTLEY, JJ.,CONCUR.
IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING,P.J., AND CHANDLER, J.