

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-341-CR

LAWRENCE SAMUEL JR.                                                                    APPELLANT

V.

THE STATE OF TEXAS                                                                          STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Lawrence Samuel Jr. appeals his conviction for forgery. *See* Tex. Penal Code Ann. § 32.21 (Vernon Supp. 2009). In six points, Samuel argues that the evidence is legally and factually insufficient to sustain his

---

[1] *See* Tex. R. App. P. 47.4.

conviction and that the trial court erred by denying his motion to suppress his statement made to police. We will affirm.

## II. BACKGROUND

In January 2007, Panthea Christakis went to Jackson-Hewitt, located in a Wal-Mart in Arlington, Texas, to have her income taxes prepared. Christakis's tax refund totaled almost $3000. The Jackson-Hewitt representative who prepared Christakis's tax return told her that her check would be available in about eight business days. The representative also told Christakis that she would need to return in order to pick up her check. According to Christakis, over two weeks passed and no one from Jackson-Hewitt contacted her. Christakis repeatedly called to inquire about her check. At first, Jackson-Hewitt's representatives explained that Christakis's check had not arrived, but later they informed her that her check had been delayed because of a misspelling and that she would need to come back and amend her paperwork in order to receive her check. But before Christakis could return, she received a letter from a bank explaining that she had cashed the check and that she owed bank fees.

Confused, Christakis called Jackson-Hewitt multiple times and explained to numerous representatives that she had never received her check. Eventually, on March 16, 2007, Jackson-Hewitt's general manager, Donald Maceachran,

2

called Christakis and told her that he would print her a new check within twenty-four hours. Christakis, however, did not receive a check until late March 2007. Christakis testified that she had never authorized anyone to cash the first check and that she had never seen Samuel before the day she testified at trial.

Maceachran testified that he first learned sometime in February 2007 that Christakis had not received her check. According to Maceachran, his office manager called him concerned that a check had been printed for Christakis but the check could not be located. Maceachran said that he did not remember whether he was ever aware that the first check might have had a misspelling on it, but he was initially unable to locate the first check when it was brought to his attention that Christakis had not received it. Maceachran testified that the original check would have been printed at the branch where Samuel worked and that all employees at that branch would have had access to Christakis's check. He also said that if Christakis had picked up the check, there should have been a photocopy of her identification and a sheet with her signature indicating that she had picked up her check, but that neither of these items were found in her file. Maceachran said that after he learned the check was missing, he called an employee meeting which Samuel attended. Maceachran stated that he had each employee—including Samuel—write down what they

3

knew about the missing check. By Maceachran's account, Samuel responded that he "had never seen the check and had nothing to do with the disappearance of the check." Maceachran then called Jackson-Hewitt's bank in an effort to get a reprint of the check and learned that the first check had in fact been cashed.[2] Maceachran investigated.

The bank faxed Maceachran a copy of the negotiated check, and he learned that the check had been cashed at a convenience store in Fort Worth. Maceachran went to the store and learned that whoever cashed the check had presented Samuel's identification along with the check. Maceachran also learned that the negotiated check also contained Samuel's thumbprint on it. Maceachran said that he fired Samuel shortly after learning these things. According to Maceachran, his files indicated that he fired Samuel on February 27, 2007. Maceachran identified Samuel at trial as the man he fired. Maceachran also contacted the Arlington Police Department.

Abdul Wafayee, the owner of the convenience store where the first check was negotiated, testified at trial. Wafayee said that his store was a

---

[2] The record indicates that Jackson-Hewitt customers do not receive their original checks issued by the IRS; rather, customers grant Jackson-Hewitt the authority to deposit original IRS checks into a Jackson-Hewitt bank account and then issue new checks in the amount of the IRS return minus Jackson-Hewitt's fees for preparing the customers' tax returns.

combination gas station, grocery store, and check cashing store. According to Wafayee, whenever a check is cashed for more than $500, he makes a photocopy of the check, a photocopy of the driver license of the person who is cashing the check, and the right thumbprint of the person cashing the check.

Wafayee said that he was familiar with Samuel because Samuel was a routine customer. He said that on the night the check was cashed,[3] Samuel came to the store and presented the check, his driver license, and his business card. Wafayee also testified that Samuel came in with a file and explained that he was cashing the check for one of his clients. Originally, Wafayee testified that it was Samuel who signed the back of the check with the signature "P. Christakis," but later Wafayee said that he did not remember whether the check was signed in his presence or prior to the check being presented to him. When asked again by the State whether Samuel signed the check, Wafayee said that he was "positive" that Samuel signed the check in his presence. But when defense counsel asked again who signed the check, Wafayee said both that his testimony was that Samuel had signed the check and also that he did not remember who signed the check. Wafayee admitted that English is not his "first language."

---

[3] The negotiated check bares a banking mark that the check was processed by the processing bank on February 26, 2007.

Wafayee said that he cashed the check because Samuel "works for the tax office, I trusted him. He had [a] business card." According to Wafayee, he could not remember whether Samuel had come in by himself or with a woman and that if Samuel had come in with a woman, he did not remember what she looked like. Wafayee also said that he did not remember telling the police that Samuel had come in alone to cash the check.

The State then called Arlington Police Detective Darren McMichael to the stand. The court held a motion to suppress hearing outside the presence of the jury. Samuel argued that the statement he made to McMichael during McMichael's investigation should be suppressed because Samuel believed he was in custody after McMichael read a card to Samuel that contained *Miranda* warnings. Specifically, Samuel argued that reading *Miranda* warnings to an individual who is not in custody is "inappropriate" because it would lead someone to "believe that, in fact, they were in custody." Samuel also contended at the hearing that he was not challenging the voluntariness of his statements nor was he alleging that McMichael "did anything uncordial or coercive in obtaining [Samuel's] statement."

At the hearing, McMichael testified that during his investigation — in early April 2007 — he called Samuel and asked him "to voluntar[ily] come in and give a statement regarding the incident." McMichael said that Samuel came to the

6

station on his own and that no one went and picked him up and brought him to the station. After Samuel arrived, McMichael informed Samuel that he was not under arrest, that "he was there voluntarily[,] and [that] he could leave at any time." McMichael said that it was the Arlington Police Department's policy to read a "city-issued green *Miranda* card" to anyone who was being interviewed. The State introduced into evidence a card bearing *Miranda* warnings that has a line drawn diagonally across the text and a signature. McMichael said that policy dictated that he read the card and have any interviewee sign a diagonal line drawn on the card after the warnings are read to indicate the interviewee waived those rights. According to McMichael, the signature on the green card was Samuel's and the signature indicated that proper policy had been followed. McMichael testified that he made it clear to Samuel that he was free to leave. He also testified that Samuel was not restrained in any way, there was no warrant for Samuel's arrest, Samuel was the closest to the door in the interview room, and there were no other officers in the room with them.

McMichael recalled that after he confronted Samuel with evidence that Christakis's check had been cashed by someone using Samuel's identification, Samuel explained that "a woman had come and approached him about having difficulties cashing the check because there was a misspelling of her name."

7

After he was approached, Samuel explained that he took the check to a convenience store along with the woman and helped her cash the check. McMichael asked Samuel to describe the woman. After Samuel gave a description of the alleged woman, McMichael challenged Samuel by explaining that he "had factual evidence [that McMichael] knew the actual correct answers to and advised him that . . . the answers he was giving me were not the fact." McMichael said that Samuel immediately asked if there was something he could do "to make this go away." According to McMichael, Samuel even offered to pay the money that was "taken from the check [if] this [would] go away." McMichael responded that the victim was adamant about prosecuting. At this time, by McMichael's account, Samuel stated that he "didn't want to talk much more about the case."

McMichael said that he then informed Samuel that he would make note in his report of his decision to conclude the interview. When asked what happened next, McMichael said:

> Well, as I'm wrapping up my notes and everything that I had on the table, I told him that -- I said, [Samuel], I said, there are reasons that people make decisions that they do, and I said, sometimes people opt for bad decisions. And, at that point, he put his hands in his head and said, you hit the nail on the head. And so we got up and started to proceed out of the interview room and down the hallway to exit the police station.

8

McMichael said that as they walked toward the exit, Samuel said that the pressures of money had gotten to him, that he had cashed the check because he needed money to pay bills, and that no one had accompanied him to the convenience store to cash the check. McMichael said that the interview lasted "[a]pproximately 30 to 40 minutes" and that after Samuel made these statements to him, Samuel left the police station. McMichael also said that he did not record the interview because of technical difficulties. At the conclusion of the hearing, the trial court overruled Samuel's objection and said, "I'm going to find that [Samuel] was not in custody when he made the statement."

McMichael then testified before the jury. McMichael retold many of the same things he had already said during the hearing. He also detailed his investigation and how it led him to Samuel. McMichael said that he interviewed Wafayee and Wafayee had indicated that Samuel was alone when he cashed the check and that Samuel was the person who signed the check. In addition, McMichael said that during his investigation Christakis signed a forgery affidavit which indicated that she was not the person who cashed the check and that she had not benefitted from the check being cashed in any way. McMichael also said that Christakis was interested in having the person who cashed the check prosecuted.

9

Samuel testified in his own defense. According to Samuel, a coworker had brought his attention to a check with a misspelling of Christakis's name on it in January 2007. Samuel said the coworker laughed about the misspelling made by another coworker who frequently made mistakes. Samuel said that sometime in "mid February" a woman came to his Jackson-Hewitt booth claiming to be Christakis. Samuel said that it was late, "about 9:00." Samuel described the woman as crying because her check had a misprint on it, and Samuel said she claimed that she was unable to cash her check. Samuel said that when she showed him the check, he was already familiar with it because of the coworker who had previously pointed it out to him. Samuel testified that he told the woman that he could help her cash her check by taking her to a convenience store and that he felt compelled to do so because he knew of the misspelling and he knew that people who come to Jackson-Hewitt are typically lower income individuals.

Samuel stated that the woman presented an ID to him, but that he did not look at it closely because of his familiarity with the check. According to Samuel, the woman followed him in a separate car to Wafayee's convenience store, where they both went in and presented the check to Wafayee, and he showed Wafayee his ID. Samuel said that the woman who brought the check to him was standing next to him in the convenience store while Wafayee

10

processed the check. Samuel said that after he cashed the check, "I gave her the money." Samuel testified that after he gave her the money, she thanked him, they went their separate ways, and he never saw her again. Samuel also said that he was never fired from Jackson-Hewitt; rather, he "got another job." Samuel said that Christakis, who had testified earlier, was not the woman who came to him asking for help.

Samuel also testified to his account of the interview with McMichael. Samuel said that McMichael called him in late March. According to Samuel, he thought that he was being interviewed about a scanner that was missing from Jackson-Hewitt. When McMichael asked him about the check, Samuel said that he told him that he had helped a woman cash a check that had a misspelled name on it. Samuel denied ever telling McMichael that he had cashed the check alone. Samuel also denied ever signing the check. Samuel claimed that the check was already signed when it was received by him. Samuel said that McMichael claimed to have a videotape of him cashing the check.

Samuel admitted that he told McMichael that he was willing to pay back whatever money Jackson-Hewitt might have lost because of his actions but that he had offered to do so because he believed he had made a mistake helping a person, not because he had committed a crime. Samuel said that

11

although he was intimidated by McMichael—because McMichael is "a pretty big guy"—he left the police station after the interview. Samuel denied ever telling McMichael that he had cashed the check alone because of money pressures. After closing arguments, the jury retired to deliberate. The jury found Samuel guilty and assessed punishment as six years' confinement. This appeal followed.

### III. SAMUEL'S MOTION TO SUPPRESS

In his third, fourth, fifth, and sixth points, Samuel contends that the trial court erred by refusing to suppress his oral statement to McMichael. Specifically, Samuel contends that his statement was involuntary because it was the result of "duress, coercion and improper promises"; that McMichael did not honor his request to end the interview; and that his rights guaranteed under Article 38.22 of the Texas Code of Criminal Procedure were violated when his statement was not recorded. Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005). The State counters that Samuel has failed to preserve these claims for our review because they do not comport with his objections made at trial. *See Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (stating that it is well settled that the legal basis of a complaint raised on appeal cannot vary from that raised at trial). The State also counters that the trial court did not err by allowing McMichael to testify about Samuel's statement.

12

We will assume without deciding that Samuel has preserved these points for our review. We conclude that the question that is asked in each of Samuel's points is: Did the trial court err by determining that Samuel was not in custody when McMichael interviewed him? *See Beckwith v. United States*, 425 U.S. 341, 346, 96 S. Ct. 1612, 1616 (1976) (reasoning that the need to scrupulously honor a defendant's invocation of *Miranda* rights does not arise until created by the pressures of custodial interrogation); *see also Davis v. Allsbrooks*, 778 F.2d 168, 170 (4th Cir. 1985) (precustodial assertion of right to remain silent, even after *Miranda* warnings given, does not require termination of interrogation). We answer this question in the negative and hold that the trial court did not err in overruling Samuel's motion to suppress his statement.

The Fifth Amendment to the United States Constitution commands that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V; *see also* U.S. Const. amend. XIV. The warnings set out by the United States Supreme Court in *Miranda v. Arizona* were established to safeguard an uncounseled individual's constitutional privilege against self-incrimination during custodial interrogation. 384 U.S. 436, 442, 86 S. Ct. 1602, 1611 (1966). The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a

13

person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. Unwarned statements obtained as a result of custodial interrogation may not be used as evidence by the State in a criminal proceeding during its case-in-chief. *Id*.; *but see Harris v. New York*, 401 U.S. 222, 225–26, 91 S. Ct. 643, 645–46 (1971) (holding that *Miranda* does not foreclose the use of an unwarned statement to impeach a defendant's credibility if the statement was not coerced and was given voluntarily).

In Texas, Article 38.22 of the Texas Code of Criminal Procedure governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding. Section 3 provides that an oral statement is admissible against a defendant in a criminal proceeding if, among other things: (1) the statement was electronically recorded; (2) the defendant was given the warnings set out in Section 2(a) before the statement was made and it is included on the recording; and (3) the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. Tex. Code Crim. Proc. art. 38.22 § 3(a)(1)–(2). The warnings provided in Section 2(a) are virtually identical to the *Miranda* warnings, with one exception—the warning that an accused "has the right to terminate the interview at any time" as set out in Section 2(a)(5) is not required by *Miranda*. *See Perillo v. State*,

14

758 S.W.2d 567, 575 (Tex. Crim. App. 1988) (stating "that *Miranda* warnings must precede a confession offered under Article 38.22, § 3(c)"). As with the *Miranda* warnings, the warnings in Section 2(a) of Article 38.22 are required *only* when there is custodial interrogation. Tex. Code Crim. Proc. art. 38.22 §§ 3(a), 5; *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). Our construction of "custody" for purposes of Article 38.22 is consistent with the meaning of "custody" for purposes of *Miranda*. *Herrera*, 241 S.W.3d at 526.

When considering "custody" for *Miranda* purposes, we apply a "reasonable person" standard: "[a] person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322–25, 114 S. Ct. 1526, 1528–30 (1994)). Our custody inquiry also includes an examination of all of the objective circumstances surrounding the questioning. *Dowthitt*, 931 S.W.2d at 255. The mere fact that an investigation takes place in a police station does not make it custodial. *Cedillos v. State*, 250 S.W.3d 145, 152 (Tex. App.—Eastland 2008, no pet.). And being the focus of the investigation does

not equate to being in custody. *Meek v. State*, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990) (citing *Beckwith*, 425 U.S. at 347, 96 S. Ct. at 1616).

A trial judge's ultimate custody determination presents a mixed question of law and fact. *Herrera*, 241 S.W.3d at 526 (citing *Thompson v. Keohane*, 516 U.S. 99, 112–13, 116 S. Ct. 457, 465 (1995)). Therefore, we afford almost total deference to a trial judge's custody determination when the questions of historical fact turn on credibility and demeanor. *Herrera*, 241 S.W.3d at 526–27. Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial judge's custody determination de novo. *Id*. The defendant, not the State, carries the initial burden of establishing that a statement was the product of custodial interrogation. *Id*.

In this case, McMichael testified that Samuel came to the police station on his own. McMichael said that he informed Samuel that he was not under arrest and that he was free to terminate the interview and leave at any time. Samuel signed a card indicating that he received warnings consistent with Article 38.22—including that he had the right to terminate the interview at any time. By McMichael's account, the interview lasted between thirty and forty minutes, and when the interview concluded, Samuel left the police station. Even Samuel testified that he left when the interview concluded. Samuel never

16

testified that he did not feel free to leave the interview. Samuel only said that he was intimidated by McMichael because Samuel perceived McMichael to be "a pretty big guy."

Affording almost total deference to the trial court's determination regarding McMichael's credibility and demeanor, we hold that Samuel was not in custody at the time he made his statement to McMichael. *See Cedillos*, 250 S.W.3d at 152 (holding that trial court did not err finding defendant was not in custody when defendant was informed he was not under arrest, received *Miranda* warnings, was told he could terminate the interview, and was allowed to leave after the twenty- to thirty-minute interview). The trial court therefore did not err by denying Samuel's motion to suppress. We overrule Samuel's third, fourth, fifth, and sixth points.

## IV. SUFFICIENCY OF THE EVIDENCE

In his first and second points, Samuel contends that the evidence is legally and factually insufficient to support his conviction for forgery. We disagree.

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v.*

17

*Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor

18

of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417.

To support Samuel's conviction for forgery, the State was required to prove that Samuel, with the intent to defraud or harm another, passed a writing that purported to be the act of another who did not authorize the act. *See* Tex. Penal Code Ann. § 32.21; *Williams v. State*, 688 S.W.2d 486, 488 (Tex. Crim. App. 1985). The intent to defraud or harm another may be established by circumstantial evidence, and the burden is on the prosecution to prove each and every element of the offense charged. *Williams*, 688 S.W.2d at 488. In the case of forgery, the culpable mental state requires proof of knowledge that the instrument is forged. *Id.*

Viewing all of the evidence in the light most favorable to the prosecution, the record reveals that Samuel admitted to McMichael that he had cashed the check alone because he needed money to pay bills and that there was never a woman claiming to be Christakis who accompanied him to the convenience store to cash the check. There is no evidence that anyone but an employee ever accessed the check that was cashed. Samuel had access to the check. Christakis testified and signed affidavits that she never received the first check. Samuel's supervisor testified that Samuel originally denied ever knowing anything about the check. The jury could have reasonably concluded that this

19

statement to Maceachran and his changing statement to McMichael showed a consciousness of guilt. *See Lee v. State*, 866 S.W.2d 298, 302 (Tex. App.—Fort Worth 1993, pet. ref'd) (holding that lying to a neighbor about a foul smell, along with other factors, showed defendant's guilt and awareness of the crime); *see also Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet. ref'd) (holding that jury could reasonably conclude that defendant lied because he had something to hide and changing his story was evidence of his consciousness of guilt). The record also shows that Samuel's identification and thumbprint were used to cash the check and no other person's identification or thumbprint were ever recorded. Therefore, a rational trier of fact could have found, beyond a reasonable doubt, that Samuel committed the essential elements of forgery. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. We hold that the evidence is legally sufficient to support Samuel's conviction and overrule his first point.

Furthermore, we conclude that the evidence demonstrating Samuel's guilt is not so weak that the jury's determination is clearly wrong and manifestly unjust and that there does not exist conflicting evidence that so greatly outweighs the evidence supporting his conviction that the jury's determination is manifestly unjust. The evidence supporting the factual sufficiency of Samuel's conviction includes his admission to police that he cashed the check

alone because he needed the money. Evidence that he did cash the check includes: Samuel had access to the check, Samuel admitted familiarity with the check, and Samuel acknowledged cashing the check using his own identification.

As alleged contrary evidence, Samuel contends that there is ample evidence to support his story to police and the jury that he was performing a customer service and that he actually did accompany Christakis to the convenience store where she went into the store with him as he cashed the check for her. But Samuel himself testified that Christakis was not the woman he claimed to have helped. Christakis testified that she had never seen Samuel before trial. Furthermore, there was testimony from both McMichael and Maceachran that Samuel had either lied about ever seeing the check or had admitted that he lied about a woman accompanying him to the store and that he cashed the check because he was desperate for money. There was also additional testimony from McMichael that Samuel asked to pay the money back in order to make the charges "go away." The jury could have determined that Samuel made up the story about a woman accompanying him to the convenience store and that he did in fact cash the check because he needed the money. Giving due deference to the jury's determinations, particularly those determinations concerning the weight and credibility of the evidence, we hold

that the evidence preponderates in favor of Samuel's conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417. Thus, we hold that the evidence is factually sufficient to support Samuel's conviction and overrule his second point.

## V. CONCLUSION

Having overruled each of Samuel's six points, we affirm the trial court's judgment.


BILL MEIER
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 25, 2010

22